**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:26-cv-26957**

**EDLENE ZIMILES and ANDREI ZIMILES, individually and as trustee of the Andrei Zimiles Revocable Living Trust,**

Plaintiffs,

v.

**BROAD STREET GLOBAL MANAGEMENT LLC**, **BROADSTREET, INC., DAVID FEINGOLD, STEVEN BALDASSARRA and JOSEPH BALDASSARRA,**

Defendants.

_______________________________________/

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ i

COMPLAINT ........ 1

INTRODUCTION ........ 1

PARTIES ........ 5

PLAINTIFF ........ 5

DEFENDANTS ........ 5

JURISDICTION AND VENUE ........ 7

FACTUAL ALLEGATIONS ........ 8

I. BSG Fund's Formation, Operation, and Relation to the Broadstreet Enterprise. ........ 8

II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities........ 9

III. The Offering Documents. ........ 11

IV. The BSG Fund Series ........ 13

a. Merchant Cash Advance ("MCA") ........ 14

b. Real Estate Infrastructure Development ("Infrastructure") ........ 15

c. Pre-IPO securities ("Pre-IPO") ........ 15

d. Fixed income securities: ("Fixed Income") ........ 16

e. Hotel Projects ("Hotel") ........ 16

f. Custom Home Building ("Home Building") ........ 17

g. Crystal Lagoons ("Crystal Lagoons") ....................................................17

h. Bitcoin Mining ("Bitcoin Mining") ........................................................17

i. Altcoin Mining ("Altcoin Mining")………………………………………..18

j. Self-Storage Facilities ("Self-Storage")………………………………….18

V. Broadstreet Knowingly Raised Money from Non-Accredited Investors ......19

VI. Feingold and the Baldassarras Have Taken More than $170 Million From the BSG Fund. ..........................................................................................20

VII. BSG Management and the Baldassarras Are Investment Advisers ..............23

VIII. Feingold and the Baldassarras Control BSI and BSG Management .............24

IX. The July 2023 Compliance Acknowledgement Update ................................27

a. Broadstreet Collected 30% in Upfront Fees It Was Not Entitled To .......28

b. Broadstreet Acted As Plaintiff's Investment Advisor ..............................30

X. In 2025 Broadstreet Ran Out of Money to Continue Paying the Guaranteed Distributions. ............................................................................................31

XI. Feingold's Role in the Scheme. ......................................................................32

XII. The Baldassarras' Role in the Scheme ..........................................................34

XIII. Beginning in March 2025 Broadstreet Initiated Its Scheme to Get Rid of the Investors in the Altcoin Series. .....................................................................36

XIV. Beginning in May 2025 Investors Start Receiving Reports from the Court Appointed Monitor in the SEC Enforcement Action. ...................................42

XV. Monitor's First Status Report .......................................................................43

XVI. Monitor's Third Status Report.......................................................................44

XVII. Monitor's Fourth Status Report ........................................................ 46

XVIII. Broadstreet Initiated Its Scheme to Get Rid of its Remaining Investors in November 2025 by Issuing a Redemption Notice ........................................ 47

XIX. Broadstreet's July 27, 2026 Investor Update ........................................ 49

XX. The Plaintiffs and Representations Broadstreet Employees Made Directly to Them. ........................................................................................ 50

CLAIMS FOR RELIEF. ................................................................................ 57

COUNT I – BREACH OF CONTRACT (April 13, 2024 Side Letter Agreement) 57

COUNT II – BREACH OF CONTRACT (The Operating Agreement) ................. 58

COUNT III – CONVERSION ........................................................................ 59

COUNT IV – CIVIL THEFT ........................................................................ 61

COUNT V – BREACH OF CONTRACT (Altcoin Participation Vote) ................. 62

COUNT VI – FRAUD IN THE INDUCEMENT (Altcoin Participation Vote) ..... 65

COUNT VII – FRAUD ................................................................................ 70

COUNT VIII – BREACH OF FIDUCIARY DUTY ............................................ 73

COUNT IX – DISGORGEMENT ................................................................... 75

COUNT X – ACCOUNTING ........................................................................ 76

COUNT XI – CONTROL PERSON LIABILITY ................................................ 77

COUNT XII – CONSTRUCTIVE TRUST, EQUITABLE LIEN, AND/OR SEGREGATION OF SALE PROCEEDS ........................................................ 78

PRAYER FOR RELIEF ................................................................................ 79

JURY TRIAL DEMAND ................................................................................ 81

# COMPLAINT

Plaintiffs, Edlene Zimiles and Andrei Zimiles, individually and as trustee of the Andrei Zimiles Revocable Living Trust (collectively the "Zimiles" or "Plaintiffs"), by and through the undersigned counsel hereby file this lawsuit against Defendants Broad Street Global Management LLC, Broadstreet, Inc., David Feingold, Steven Baldassarra and Joseph Baldassarra[1] (collectively "Defendants" or "Broadstreet"), and in support thereof state as follows:

## INTRODUCTION

1) The Zimiles bring this lawsuit because Defendants, as agents of the Broad Street Global Fund, LLC ("BSG Fund"), are trying to steal **over half a billion dollars** from their own investors, including Plaintiffs' approximate **$370,000.00** investment in the BSG Fund's Altcoin Series. They are attempting to do this while there is a pending SEC Enforcement Action against these same individuals and entities related to their involvement with the BSG Fund, *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-GAYLES/SHAW (S.D. Fla.).

2) Broadstreet is trying to pull off this heist of investor assets by fraudulently misrepresenting the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors to accept as an "in-kind' redemption, while Broadstreet keeps the remaining assets (not involved in the "in-kind" transactions for ZSQR and SOUL) that were acquired with over $500 million of investor assets for itself. Broadstreet is keeping hotels, auto dealerships, self-storage facilities, 70% of the infrastructure projects, pre-IPOs, a custom home building company and a man-made beach/water park called Crystal Lagoons. Meanwhile

[1] The "**Baldassarras**" or the "**Baldassarras Brothers**" refer collectively to Steven Baldassarra and Joseph Baldassarra.

its investors get stock that may be restricted for the next 3 ½ years in companies that have no track record that Broadstreet claims are worth $3.6 billion with absolutely nothing that supports that valuation. Broadstreet is doing all this after it has already paid itself over $300 million (or 30%) of the over $1 billion it raised from its investors in upfront fees for 5 years of services that it never provided. This is theft in broad daylight.

3) Broadstreet ran the BSG Fund in Ponzi-like fashion. Broadstreet raised money for the BSG Fund by guaranteeing investors interest payments, sometimes as high as 28% annually, that far exceed income being generated from any of the BSG Fund's investments. Broadstreet was able to maintain the distribution payments to its investors with a combination of paying old investors with new investor money and using money from the Merchant Cash Advance (MCA) Series investment to pay distributions to all BSG Fund's investors regardless of the investment Series that the investor chose.

4) Broadstreet provided its investors with monthly investor reports that made it appear that the distributions they received came from the investment that the investor selected when that was not the case. These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money the investor allocated to a particular investment Series made it to that investment, when in fact 30% of the funds the investor provided for their selected investment was immediately stripped out as fees.

5) Broadstreet's house of cards came crashing down in 2025 when the Court in the SEC Enforcement Action issued its January 31, 2025 Order (and later Orders) preventing Broadstreet from raising new investor funds (DE 18 at 2, DE 88 at 1-2, DE 95 at 9 in *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-GAYLES/SHAW (S.D. Fla.)) and the MCA Series was

forced into a liquidation due to a money-in versus money-out loss of over $40 million from the excess withdrawals from that investment.

6) Realizing that it could no longer keep up the pretense that its investments were generating money, Broadstreet came up with a two-step plan to get rid of all the BSG Fund investors. First, Broadstreet convinced all its investors in its Altcoin Series to allow Broadstreet to transfer their interest in the Altcoin Series to a publicly traded company called Z Squared Inc. (ZSQR). Broadstreet did this in March 2025 by fraudulently representing to the Altcoin investors that if they agreed to move their investments to a publicly traded company, they would receive their investment back plus 100% or 50% of their investment (depending on when they invested) and by fraudulently representing to the Altcoin investors that Broadstreet and/or its affiliates would only be paid after the investors received their entire remuneration. Broadstreet had already paid itself and its affiliates 30% of the money raised for the Altcoin Series and the Z Squared stock that Broadstreet provided to the Altcoin investors was not worth anything close to what Broadstreet represented, and thus Broadstreet fraudulently induced its Altcoin investors to agree to transfer their ownership interest in the Altcoin Series.

7) Next, to get rid of its remaining investors, in November 2025 Broadstreet notified its investors that the BSG Fund is going private and will no longer have any investors. On November 14, 2025, Broadstreet sent each of its investors a **binding** Redemption Notice giving each investor the right to choose how they wanted to exit the BSG Fund. Redemption Choice – A promised to pay investors the cash value of their capital account within 180 days. Redemption Choice – B promised to pay investors three times the amount of their capital account in the form of common stock in a Cayman Island special purpose acquisition company ("SPAC") called Soulpower Acquisition Corp. (SOUL) that may be restricted for the next 3 ½ years. In exchange

for taking the BSG Fund investors SOUL would receive approximately 30% of the BSG Fund's infrastructure projects, and Broadstreet would keep all the remaining assets of the BSG Fund.

8) The Zimiles invested in the BSG Fund with the goal of receiving a steady income stream. Having their funds locked up for years is not what the Zimiles signed up for, nor is it what they were told they were investing in. Broadstreet is forcing the Zimiles, and presumably other BSG Fund investors, into an unsuitable investment that is expressly contrary to the Zimiles' investment objectives and risk tolerance.

9) In an effort to stop Broadstreet from taking away their rights, the Zimiles retained the undersigned counsel to send BSG Fund a civil theft demand letters objecting to the "in-kind" redemption. Plaintiffs' Civil Theft Demand Letter is attached hereto as **Exhibit A**.

10) On June 8, 2026, Defendants filed a Complaint in *Broad Street Global Management v. Schulman et al.*, Case No.: 1:26-cv-23998-GAYLES (S.D. Fla.) to obtain a declaratory judgment that would force all BSG Fund investors to accept as an "in-kind' redemption restricted shares in Soulpower Acquisition Corp. If granted, it would not only prevent approximately **$148 million** in cash redemptions from flowing back to BSG Fund investors, but it would allow Broadstreet to steal over **$500 million** in assets acquired with its investors' funds while its investors get a potentially worthless piece of paper. Broadstreet must be stopped.

11) For these reasons and others, the Zimiles hereby file this lawsuit seeking, *inter alia*: (i) the return of misappropriated funds and assets; (ii) the return of unpaid distributions that the Zimiles are entitled to; (iii) rescission of the Zimiles' investment in the BSG Fund including the conversion of their ownership interest in the Altcoin Series into shares of Z Squared, Inc.; (iv) injunctive relief preventing Defendants from selling or transferring away assets of any investment Series that the Zimiles have an ownership interest in; (iv) dissolution of the BSG Fund; (v) removal

of the manager of the BSG Fund and appointment of a Receiver to oversee the liquidation of the BSG Fund; (vi) attorneys' fees where provided for by contract and statute; and (vii) when they are granted leave to do so, punitive damages against Defendants based on their outrageous conduct arising from their theft and diversion of hundreds of millions of dollars from innocent investors.

## PARTIES

### PLAINTIFFS

12) Edlene Zimiles resides in the State of New York.

13) Andrei Zimiles resides in the State of New York.

14) The Zimiles' investments in the BSG Fund at issue in this lawsuit are as follows:

| Investor Name | Investment | Equity Balance | Initial Contribution |
|---|---|---|---|
| **Edlene Zimiles** | Crypto/Altcoin Mining - 28% Annual Return | $70,000.00 | 4/15/2024 |
| | **Investor Total:** | **$70,000.00** | |
| | | | |
| **Andrei Zimiles Revocable Living Trust** | Crypto/Altcoin Mining - 28% Annual Return | $300,000.00 | 4/15/2024 |
| | **Investor Total:** | **$300,000.00** | |
| | | | |
| **COMBINED TOTAL** | | **$370,000.00** | |

### DEFENDANTS

15) David J. Feingold, Esq. ("Feingold") is a citizen of the State of Florida who resides in the Southern District of Florida. For purposes of this lawsuit based on diversity of citizenship, Feingold is a citizen and resident of Florida. Feingold is also the Chief Executive Officer ("CEO") of BSI and a control person over BSI and BSG Management. The Baldassarras have delegated the management of many, including the largest, business lines funded by BSG Fund, including real

estate infrastructure projects and merchant cash advance ("MCA portfolios"), to Feingold. Feingold is an attorney licensed in the state of Florida. In 1999, the Commission entered an order against Feingold to cease and desist from committing or causing any violations of Section 5 of the Securities Act and Rule 10b-13 of the Exchange Act. In 2011, Feingold and two co-defendants paid $18.8 million to settle—without admitting—charges by the Federal Trade Commission that the First Universal mortgage modification business deceived indebted homeowners by charging thousands of dollars in upfront fees while doing little to relieve the customers' debts. The Internal Revenue Service has also assessed fraud penalties against Feingold alleging that he dodged taxes on millions he got from Broadstreet and other private equity funds.

16) Joseph Baldassarra is a citizen of the State of South Carolina. For purposes of this lawsuit based on diversity of citizenship, Joseph Baldassarra is a citizen and resident of South Carolina. He is also a managing member of BSG Management, the President of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Defendants BSG Management and Steven Baldassarra; soliciting investors for BSG Fund; and supervising BSI's internal sales staff who, among other things, solicit investors for BSG Fund. Joseph Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

17) Steven Baldassarra is a citizen of the State of South Carolina. For purposes of this lawsuit based on diversity of citizenship, Steven Baldassarra is a citizen and resident of South Carolina. He is also a managing member of BSG Management, the chief operating officer ("COO") of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Defendants BSG Management and Joseph Baldassarra; and performing back-office functions for BSG Fund, including overseeing

BSG Fund's and BSG Management's bank accounts and its accounting staff. Steven Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

18) Broad Street Global Management LLC ("BSG Management") is a South Carolina LLC that was formed on or about October 2018. BSG Management is the designated manager of BSG Fund. BSG Management is owned and managed by the Baldassarras. BSG Management (through the Baldassarras) acts as an investment adviser with respect to BSG Fund. BSG Management has received approximately $9 million directly from investors and more than $871 million from the bank accounts of BSG Fund and BSG Series CM, LLC's ("BSG CM Series").

19) Broad Street Inc. ("BSI") is a Delaware corporation with its principal place of business in Greenville, South Carolina. It was formed on or about June 2022. BSI's voting shares are owned in equal parts by the Baldassarras and David J. Feingold ("Feingold") and unanimity by all three is required for shareholder decisions. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI. Feingold and the Baldassarras control BSI. BSI has received more than $200,000, an interest in a registered broker-dealer, and ownership over certain real estate assets.

**JURISDICTION AND VENUE**

20) Diversity jurisdiction over this matter is proper because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

21) This Court has personal jurisdiction over Defendants through Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District.

22) Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. BSG Fund's Formation, Operation, and Relation to the Broadstreet Enterprise.

23) BSG Fund was formed in September 2020 to operate as a private equity fund. In the fourth quarter of 2020, BSG Fund purchased substantially all the investment assets of Broad Street Global Fund SCSp, a Luxembourg entity, which was a predecessor fund to the BSG Fund.

24) BSG Fund's offering materials claim that it is divided into a number of Series, each of which focuses on a separate and distinct investment opportunity.

25) BSG Fund is managed by BSG Management, which has authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra (collectively the "Baldassarras") are the managing members of BSG Management, and BSG Management acts through the Baldassarras. Since September 2020, BSG Management has been controlled by the Baldassarras and since June 2022, as alleged further below, Feingold has also controlled BSG Management.

26) BSG Management is not registered as an investment adviser with the SEC, although as alleged below it acts as an investment adviser with respect to BSG Fund.

27) In or around June 2022, Feingold formed and became the CEO of BSI. Joseph Baldassarra is the President of BSI and Steven Baldassarra is the Chief Operating Officer of BSI. The sales staff that solicits investors for BSG Fund are BSI personnel. BSI is listed as the owner on some of the real estate assets acquired with BSG Fund's funds. BSI oversees assets in which BSG Fund has invested.

28) From at least July 2022 until the present, BSI's publicly-available website contains information about certain of the Broad Street Entities, and illustrates the related nature of the Broad

Street Entities and the BSG Fund Series. For example, from approximately July 2022 through approximately March 2024, the following diagram was included on BSI's website:




## II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities.

29) From October 1, 2020 through the present (the "Relevant Period"), investors have deposited more than $1 billion in the bank accounts of BSG Fund, BSG Series CM, and BSG Management. Of this amount, investors deposited approximately $868 million in the BSG Fund's bank accounts, approximately $199 million in BSG CM Series' bank accounts, and approximately $9 million in BSG Management's bank accounts.

30) From the more than $1 billion that investors deposited in the above-mentioned bank accounts, approximately $880 million has been transferred to (or directly deposited) in BSG Management's bank accounts and extensively commingled. The chart below demonstrates the flow of investor funds to BSG Management:




31) During the Relevant Period, BSG Management has continuously solicited money from, and offered and sold BSG Fund LLC units in a variety of Series to investors.

32) From approximately October 1, 2020 until approximately May 2022, BSG Management used an internal sales staff to offer and sell BSG Fund LLC units. The internal sales staff was used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

33) From approximately June 2022, until at least October 31, 2024, BSG Management and BSI have used an internal sales staff comprised of BSI personnel to offer and sell BSG Fund LLC units. BSI's staff is used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

34) In addition, since at least August 2022, BSG Management has utilized registered broker-dealers to sell the offering pursuant to placement agreements.

35) As a result of the solicitation efforts undertaken by BSG Management, BSI, and associated broker-dealers, BSG Management has raised more than $1 billion on behalf of the BSG Fund from over a thousand passive investors. These investors are located across the United States, including in this district, and abroad.

36) Investors in BSG Fund committed funds in cash or via wire transfer to participate in an investment opportunity. They were promised significant returns, which were to be generated from passive business opportunities described in each of the Series' pitch decks.

37) BSG Fund's numerous investors have no ability to influence the management of BSG Fund under its operating agreement and are wholly dependent on the efforts of the Baldassarras and Feingold to select and oversee investments to generate their expected returns.

38) BSG Fund has no way to act independently from BSG Management.

**III. The Offering Documents.**

39) BSG Management typically provides prospective investors with materials that detail the terms of the potential investment, including a subscription agreement, operating agreement, private placement memorandum, and supplemental materials pertaining to specific BSG Fund Series, including Supplemental Series Schedules and pitch decks (the "Offering Documents").

40) BSG Fund's Subscription Agreement reflects that each investor received BSG Fund's operating agreement and private placement memorandum prior to investing.

41) BSG Fund has had at least three operating agreements: a Limited Liability Company Agreement dated as of September 14, 2020 ("Original Operating Agreement"); an Amended and Restated Limited Liability Company Agreement dated as of May 26, 2022 ("First Amended Operating Agreement"); and an Amended and Restated Limited Liability Company

Agreement dated as of September 2023 ("Second Amended Operating Agreement") (collectively the "Operating Agreement").

42) These operating agreements set forth certain terms concerning the operation of the BSG Fund.

43) One version of the BSG Fund Confidential Private Placement Memorandum that has been provided to investors is dated October 2020 ("October 2020 PPM").

44) The private placement memoranda set forth the "terms and conditions of the private offering by [BSG Management] of the membership interests" to investors in the BSG Fund.

45) Both the operating agreements and the private placement memoranda state that supplemental materials about each Series will be made available to investors and to the BSG Fund. For example, the First Amended Operating Agreement states that there are "Series Schedule[s]" that "cover terms specific to a particular Series." Similarly, the October 2020 PPM states that "[a] supplement to the [private placement memorandum] … in respect of each Series will be created and distributed to prospective investors in such Series."

46) BSG Management also gave prospective investors access to materials in its internet data room, which, among other things, and at different times, has contained Supplemental Series Schedules with additional terms and conditions of the offering and pitch decks explaining the various investment opportunities.

47) Specifically, pitch decks exist for numerous of BSG Fund's Series described below. Certain Series have multiple pitch decks or pitch decks that were updated over time.

48) Feingold reviewed the Offering Documents, including the PPM and the Operating Agreements, before they were made available to potential and actual investors.

49) The BSG Fund Offering Documents were reviewed and approved by the Baldassarras before they were made available to potential and actual investors.

50) Further, BSG Fund, as a legal entity, acts through its designated manager, BSG Management, and BSG Management, as a legal entity, acts through its co-managers, Joseph Baldassarra and Steven Baldassarra. As such, BSG Management and the Baldassarras each have the ultimate authority with respect to the content of any written statements in the BSG Fund Offering Documents that were provided to investors.

51) In addition to the Offering Documents, BSG Management communicates with investors in other ways, including through BSI's website and periodic investor updates, which were issued monthly or quarterly.

52) Periodic investor updates and BSI's website were reviewed and approved by the Baldassarras before they were made available to investors.

**IV. The BSG Fund Series.**

53) As alleged above, BSG Fund's Offering Documents claim that it is divided into separate Series, each of which focuses on a different investment opportunity and has different risks. For example, the October 2020 PPM states that BSG Fund "has been established to pursue multiple investment objectives and investment strategies in different Series so investors can select the investment objectives and investment strategies to which the investor wishes to have exposure." It further states that "[a] Series may vary from other Series due to, among other things, investment strategy and objectives, risk and return profile, use of leverage, exposure to particular strategies and other factors."

54) BSG Fund investors must, at the time of purchase, select their LLC units within a particular Series.

55) During the Relevant Period, BSG Fund investors have been offered the opportunity to invest in numerous Series, including the ones listed below. BSG Fund has sometimes used the term Series and sub-Series interchangeably, with sub-Series generally being a further differentiation of a particular Series (for example, as discussed below, where there are different returns offered in MCA investments or there are investments in different pre-IPO companies, those are referred to as sub-Series).

**a. Merchant Cash Advance ("MCA"):**

56) The MCA Series contains at least three sub-Series that claim to use investor funds to invest in portfolios of MCAs, which are transactions in which a small business can receive quick funding by selling its future receivables at a steep discount. The advance is repaid by debiting a percentage of the business's daily sales.

57) The Offering Materials describe risks related to MCA investments. For example, an August 2022 MCA pitch deck explains that there is "industry risk, such as defaults and potential future regulation," and that "merchants are considered higher risk." The pitch deck claims that the high rates charged to the merchants offset these risks.

58) BSG Fund has promised to pay investors in the MCA Series a fixed annual return of 14%, 15%, or 18%, depending on the sub-Series, and a 17% return for at least one investor via a side-letter. BSG Management sent funds for these sub-Series to, among other places, Samson Horus, which has offices in New York, New York, and Boca Raton, Florida.

59) As of November 2023, BSG Management had raised approximately $87 million for BSG Fund's MCA Series.

**b. Real Estate Infrastructure Development ("Infrastructure"):**

60) The Infrastructure Series, BSG Fund's largest, contains at least nine sub-Series that claim to invest investor funds, as a pool, in the development of raw land into build-ready lots that can be sold to residential home builders.

61) The Offering Materials tout the relative safety of Infrastructure investments. For example, an undated Real Estate Infrastructure Development pitch deck notes existing contracts with numerous national homebuilders, which are "backed by the full faith and credit of the Fortune 500 top publicly traded homebuilders," and further notes that lots are presold to national homebuilders before "Broad Street and its affiliates" close on the land in order to "minimize risk."

62) BSG Fund has promised to pay investors in these sub-Series a preferred annual return of 14.6% or, for one investor, a 16% annual return pursuant to a side letter. BSG Management has sent funds for these sub-Series to, among other places, two real estate development companies, Blackstream Development, LLC and Contender Development, Inc.

63) As of November 2023, BSG Management had raised more than $168 million for BSG Fund's Infrastructure Series.

**c. Pre-IPO securities ("Pre-IPO"):**

64) The Pre-IPO Series contains a number of sub-Series, each of which is focused on acquiring stock of a specific company via forward purchase contracts before that company's stock can be publicly traded on a securities exchange.

65) BSG Management has promised to either deliver the specific shares acquired with the investor's funds or the proceeds from the sale of those shares after the company goes public or another liquidity event occurs.

66) As of November 2023, BSG Management had raised approximately $53.5 million for BSG Fund's Pre-IPO Series.

**d. Fixed income securities: ("Fixed Income"):**

67) The Fixed Income Series seeks to provide positive returns by investing in a wide variety of income generating investments in publicly-traded securities that primarily reflect debt, equity, or closed-end funds that have exposure to government agency and/or similar income generating investments.

68) BSG Fund has promised to pay investors in this Series a fixed annual return of 7%.

69) As of November 2023, BSG Management had raised approximately $2 million for BSG Fund's Fixed Income Series.

**e. Hotel Projects ("Hotel"):**

70) The Hotel Series contains at least three sub-Series that claim to invest in the purchase or construction and operation of specific hotel properties, including one Hotel project located in Daytona Beach, Florida.

71) BSG Fund has promised to pay investors in these sub-Series a return based on an ownership share of the hotel's operating income or proceeds from the sale of the property.

72) As of November 2023, BSG Management had raised approximately $19.4 million for the BSG Fund Hotel Series.

73) The BSG Fund's Quarterly Report for Q1 - 2024 lists a Raleigh, NC-TownePlace Suites as one of its hotel projects. However, the BSG Fund never acquired this hotel, and thus to the extent that Broadstreet raised any money for this hotel it did so as part of a true Ponzi scheme. See Page 17 of the BSG Fund's Q1 2024 Quarterly Report attached hereto as **Exhibit B**.

**f. Custom Home Building ("Home Building"):**

74) The Home Building Series contains at least four sub-Series that claim to invest in the construction of residential housing communities. BSG Fund has promised to pay investors in these sub-Series a return based on a profit split with the home builder.

75) On June 20, 2024, BSG Fund's partner in the Home Building Series filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, where the partner's "nerve center" is located.

76) As of November 2023, BSG Management had raised approximately $31.2 million for BSG Fund's Home Building Series.

**g. Crystal Lagoons ("Crystal Lagoons"):**

77) The Crystal Lagoons Series claims to invest in the construction and operation of a resort project in Columbia, South Carolina, featuring a clearwater recreational lagoon with beach-like areas.

78) BSG Fund has promised investors in this Series "Perpetual Income at Rates of Return Never Seen Before" in the form of a fixed annual return of 10% during the first two years of the project, and a fixed annual return of 20% thereafter with additional payments based on a 25% share of the resort's operating profits or 50% of the proceeds from the sale of the property.

79) As of September 2023, BSG Management had raised approximately $24.2 million for BSG Fund's Crystal Lagoons Series.

**h. Bitcoin Mining ("Bitcoin Mining"):**

80) The Bitcoin Mining Series claims to invest in a "wholly owned [sic] bitcoin mining facility."

81) BSG Fund has promised to pay investors in this Series a targeted annual return of 25%.

82) As of November 2023, BSG Management had raised approximately $1.9 million for BSG Fund's Bitcoin Mining Series.

**i. Altcoin Mining ("Altcoin Mining"):**

83) The Altcoin Mining Series claims to "make investments into crypto coin mining machines" that will be used to generate alternative forms of crypto assets other than Bitcoins.

84) BSG Fund has promised to pay investors in this Series a targeted annual return of 28%.

85) As of November 2023, BSG Management had raised approximately $41.8 million for BSG Fund's Altcoin Mining Series.

**j. Self-Storage Facilities ("Self-Storage"):**

86) The Self-Storage Series claims to invest in a collection of self-storage facilities.

87) BSG Fund has promised to pay investors in this Series a fixed annual return of 10% paid quarterly until projects are profitable and can sustain the 10% return based on positive cash flows generated from the self-storage facilities. Thereafter, profit distributions will be based on investor percentage ownership in the sub-Series. BSG Management has told investors that it estimates it will pay 27% annualized returns for this BSG Fund Series.

88) As of November 2023, BSG Management had raised approximately $16.6 million for BSG Fund's Self-Storage Series.

## V. Broadstreet Knowingly Raised Money from Non-Accredited Investors.

89) Broadstreet aggressively raised money for the BSG Fund in 2024. As a result, from the beginning of 2024 through October 31, 2024, approximately an additional $500 million was raised from investors.

90) In total Broadstreet raised somewhere between $1 billion and $1.2 billion from investors for the BSG Fund.

91) But not all the investors were accredited investors, and Broadstreet knew it.

92) Akhil Morada, a senior managing director at Broadstreet, Inc., often told potential investors that they did not have to worry about being an accredited investor and he would get them into the BSG Fund even though he knew they did not meet the financial requirements to be an accredited investor.

93) Mr. Morada had a practice of soliciting investors for the BSG Fund, having them wire their money to the BSG Fund, and only after he took their money did he present them with forms to sign for their investment.

94) These forms often had investors' financial information prepopulated to reflect that they were accredited investors. However, when some of the investors informed Mr. Morada that the information about their finances was incorrect, he would tell them to ignore that part, just fill out the rest of your personal information and sign the document.

95) But Mr. Morada was not the only one at Broadstreet bringing non-accredited investors into the BSG Fund.

96) Upon information and belief, Joseph Baldassarra also told potential investors that he would get them into the BSG Fund even though they did not meet the definition of an accredited investor.

97) Thus, the practice of accepting investors into the BSG Fund who were not accredited came from the top, and presumably employees of Broadstreet were instructed by upper management on how to bring investors into the BSG Fund who were not accredited.

98) As a result, many investors who could not afford to lose their life savings or were dependent on the income generated from it now have no access to their money.

## VI. Feingold and the Baldassarras Have Taken More than $170 Million From the BSG Fund.

99) From the investor monies that have become assets of the BSG Fund, Feingold and the Baldassarras have, directly or indirectly, received more than $170 million from BSG Fund.

100) Feingold and the Baldassarras have used the money they siphoned away from the BSG Fund to live a lavish lifestyle including purchasing multiple homes, yachts, an aviation company and maintaining a private jet.

### Steven Baldassarra

101) Just a Nice Day, Inc. ("Just A Nice Day") is a South Carolina corporation owned and controlled by Steven Baldassarra.

102) Through Just a Nice Day, Steven Baldassarra received more than $50 million of illicit proceeds.

103) In addition, more than $1.9 million of BSG Fund's assets have been transferred to Steven Baldassarra directly.

104) Collectively, from these payments and his proportionate interest in related entities and payments of personal expenses, Steven Baldassarra has received more than **$56.7 million** of BSG Fund's assets.

Joseph Baldassarra

105) Josephbenjamin, Inc. ("Joseph Benjamin") is a South Carolina corporation owned and controlled by Joseph Baldassarra.

106) Through Joseph Benjamin, Joseph Baldassarra received more than $65 million of illicit proceeds.

107) In addition, more than $300,000 of BSG Fund's assets have been transferred to Joseph Baldassarra directly.

108) Collectively, from these payments and his proportionate interest other related entities and personal expenses, Joseph Baldassarra has received more than **$68.2 million** of BSG Fund's assets.

David Feingold

109) More than $36 million of BSG Fund's assets have been transferred to Feingold through related entities controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

110) More than $7 million of BSG Fund's assets have been transferred to Feingold through another related entity owned by him and one of his sons and controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

111) Collectively, from these payments and his proportionate interest in Feingold's related entities and personal expenses, Feingold has received more than **$46 million** of BSG Fund's assets.

Other Ways Feingold and the Baldassarras Receive BSG Fund's Assets

112) Feingold and the Baldassarras also have arrangements to obtain money from BSG Fund's assets.

113) For example, in September 2023, BSI acquired a 24.9% ownership stake in one of the broker-dealers that sells BSG Fund LLC units through private placements (the "Broker Dealer"). The Baldassarras and Feingold, through their ownership in BSI, share in the placement fees that the Broker Dealer earns for selling BSG Fund LLC units to investors. In total, approximately $12.3 million of BSG Fund's assets have been paid to the Broker Dealer.

114) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus a MCA Company. Samson Horus charged the Broad Street Entities substantial management fees (typically, between 3% to 5% of the amount advanced to the merchant) and commissions (typically, between 10% to 15% of the amount advanced) to participate in the MCA transaction. These management fees and commissions significantly reduced the returns that the Broad Street Entities received from Samson Horus. Feingold receives half of all the management fees and 20% of the commission Samson Horus charged the Broad Street Entities.

115) As alleged above, BSG Management sends funds for the Infrastructure Series to, among others, Contender Development, Inc., of which Feingold or his family members own 35% and he is co-chairman of its board of directors. Contender Development, Inc. has paid, among other things, land acquisition fees and a share of development fees to Feingold or entities under his control.

116) As alleged above, BSG Management sends funds for the Home Building Series to, among others, Durham Homes, of which Feingold or his family members own 33%. Durham Homes pays substantial commissions and management fees from Broad Street Entities' Home Building investments to Feingold or entities under his control.

Broadstreet Global Holdings, LLC

117) Broadstreet Global Holdings, LLC ("BSG Holdings") is a South Carolina LLC. BSG Holdings is owned and managed by the Baldassarras. BSG Holdings receives funds to pay the expenses for BSG Fund, BSG Management, and BSI. BSG Holdings has received more than $134.5 million from BSG Management.

118) Collectively, the money Feingold, the Baldassarras Brothers and BSG Holdings received from the BSG Fund, add up to at least **$305.4 million** or approximately 30% of the over $1 billion raised by the BSG Fund.

## VII. BSG Management and the Baldassarras Are Investment Advisers.

119) BSG Management, Joseph Baldassarra, and Steven Baldassarra are each investment advisers within the meaning of Section 202(a)(11) of the Advisers Act. 15 U.S.C. § 80b-2(a)(11).

120) Section 202(a)(11) of the Advisers Act defines an "investment adviser" as a "person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."

121) BSG Management advises BSG Fund with respect to investments in securities. According to the October 2020 PPM, BSG Management may be paid a management fee by the BSG Fund's Series "for managing the investment and reinvestment of such Series' assets," which include investments that are securities as defined by the federal securities laws. Specifically, at least some of the investments in the Pre-IPO securities Series and Fixed Income Series are investments in securities as defined by the federal securities laws.

122) Most recently, the BSG Fund's two exit transactions involve securities traded on the NASDAQ and NYSE.

123) BSG Fund's October 2020 PPM also holds BSG Management out as an investment adviser, stating that "[f]ees charged by [BSG Management] may be greater or lower than fees charged by other investment advisers for similar services."

124) As the sole managers and owners of BSG Management, the Baldassarras are also investment advisers to BSG Fund. In their roles at BSG Management, the Baldassarras provide advice about securities for compensation to the BSG Fund and, accordingly, also meet the definition of "investment adviser."

125) As investment advisers to BSG Fund, Defendants BSG Management, Joseph Baldassarra, and Steven Baldassarra owe a fiduciary duty to BSG Fund. An investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty. The duty of care requires an investment adviser to provide investment advice in the best interest of its client. The duty of care also requires BSG Management to operate the BSG Fund in accordance with its Operating Agreements. Under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.

## VIII. Feingold and the Baldassarras Control BSI and BSG Management.

126) Feingold and the Baldassarras Brothers control BSI.

127) Feingold and the Baldassarras are senior executives at BSI. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI.

128) In addition, BSI's voting shares are owned in equal parts by the Baldassarras and Feingold and unanimity by all three is required for shareholder decisions.

129) Feingold and the Baldassarras also control BSG Management.

130) As alleged above, BSG Fund is managed by BSG Management, which has sole authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra are the managing members of BSG Management, and BSG Management acts through the unanimous agreement of the Baldassarras.

131) In or around June 2022, when he formed and became the CEO of BSI, Feingold began to control BSG Management and its management of BSG Fund, along with the Baldassarras. Although Feingold is not formally listed as a manager of BSG Management in BSG Fund's PPM or Operating Agreements, he is involved with the management of BSG Management and uses his control over BSI to direct the management of BSG Fund's operations by BSG Management. As CEO of BSI, Feingold is the most senior executive officer of BSI.

132) As alleged above, BSI's website shows the interrelated connected relationships between the Broad Street Entities. In addition, BSG Management, the BSG Fund, BSG Holdings, BSG Series CM and BSI, operate as a single organization.

133) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, and CJS Technology Select Management, LLC ("CJS") prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2022.

134) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, CJS, and BSG CM Series prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2023.

135) For almost two years, from in or around August 2022 to in or around April 2024, BSI did not have its own bank account, but instead paid its operating expenses (including its staff's

compensation) through BSG Holdings' bank account, which was funded by a share of the money taken from BSG Fund by BSG Management.

136) As alleged further below, BSG Fund's Offering Documents generically use the terms "Broadstreet," "Broadstreet Global," or "affiliates" without clearly identifying to which entity the materials refer.

137) All of the staff performing back-office roles for BSG Management (on behalf of BSG Fund) are personnel of BSI, some of whom are also shareholders of BSI, including the staff performing the compliance, operations management, and accounting functions. Likewise, the internal sales staff soliciting potential investors for BSG Fund are personnel of BSI. There is no formal separation of duties established between BSI and BSG Management.

138) Certain of BSI and BSG Management staff share the same office space.

139) Feingold is the individual with the most knowledge of and has primary oversight over the most substantial investments managed by BSG Management, including the MCA portfolios held at Samson Horus and the Infrastructure projects being developed by Blackstream Development, LLC and Contender Development, Inc.

140) Feingold receives weekly, monthly, and quarterly financial reports regarding BSG Fund from BSI staff performing BSG Management's back-office functions (on behalf of BSG Fund). These reports are typically shared with Feingold by Steven Baldassarra.

141) Feingold participates in weekly meetings with BSG Management and BSI staff, in which all matters pertaining to BSG Fund and its business lines are discussed.

142) Feingold and the Baldassarras Brothers have daily meetings via phone or video conference. No other persons typically attend these meetings, and all aspects of the Broad Street Entities are discussed.

143) Feingold and the Baldassarras Brothers jointly make decisions regarding the investment of certain of BSG Fund's assets, which occurs through BSG Management.

144) Feingold shared in the money taken from the BSG Fund by BSG Management.

145) Feingold has also involved himself in BSG Management's capital-raising activities for BSG Fund by making regular presentations to BSG Fund's potential investors concerning BSG Fund's investments via dinner meetings and on video conference calls, directly answering questions from potential investors, and preparing side letters with BSG Fund investors documenting special investment terms.

## IX. The July 2023 Compliance Acknowledgement Update.

146) In July 2023, while the SEC was investigating Broadstreet for fraud and misrepresentations to investors, Broadstreet decided to issue a Compliance Acknowledgement Update to its investors to get its investors to ratify what it had already been doing but never disclosed to the investors.

147) Broadstreet acknowledged that prior to initiating the enforcement action on January 29, 2025, the SEC investigated Broadstreet for more than two years, during which it issued more than ninety document subpoenas to third parties and Broadstreet-related entities and individuals, including Broadstreet's bank and financial institutions. DE 301 page 1 in Case 1:25-cv-20436-DPG (SD Fla.). Thus, the SEC investigation had already begun by the time Broadstreet first sent out the Compliance Acknowledgement Update.

148) On July 15, 2023, Broadstreet sent an email to its investors with the subject "URGENT BROADSTREET ACCOUNT UPDATE" that contained the following message:

> Dear Broadstreet Investor, In the next few days you will receive a very important email from "signNow" regarding updating your Broadstreet account. The email will be a simple one page document to e-sign. **The acknowledgement contains certain information which you have already seen or certified to in documents such as**

> **our ppm, data room and subscription documents. Therefore, your review and signature should be very quick. This is a very short process** but important for our regular compliance updates **and necessary to keep your account active.** Thank you in advance for your prompt attention when you receive the email from "signNow" regarding Broadstreet and your account update. As always, we are happy to have you as part of the Broadstreet family.

(Emphasis added). A copy of the July 15, 2023 Email is attached hereto as **Exhibit C**.

149) This email attempts to downplay the significance of what the investors would be agreeing to in this Compliance Acknowledgement Update. It encourages its investors to sign it without reading it by claiming they have already seen or certified the information that they would be acknowledging, which was not true. And it contains a threat that distributions will be withheld and the investor will be kicked out the fund if they do not sign. Thus, arguably, Broadstreet coerced, or at the very least misled, its investors into signing the Compliance Acknowledgment Update. A compilation of Compliance Acknowledgement Updates that Broadstreet provided its investors is attached hereto as **Composite Exhibit D**.

**a. Broadstreet Collected 30% in Upfront Fees It Was Not Entitled To.**

150) One of the things Broadstreet asked its investors to acknowledge in the Compliance Acknowledgement Updates was that Broadstreet could immediately keep 30% of the funds each investor provided as fees.

151) However, Broadstreet didn’t simply ask its investors to agree to allow it to keep 30% of their money, presumably because most investors, including Plaintiffs, would not have agreed to that.

152) Instead, Broadstreet buried this request among 15 different items and asked its investors to agree to a 30% fee in an indirect way so that it wouldn’t appear that they are asking the investors to keep 30% of their money.

153) Specifically, Broadstreet framed the acknowledgement in Paragraph 6 as follows:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

154) This acknowledgement lists several ways Broadstreet could collect fees, including paying itself 30% of the money raised as an immediate upfront fee for the promise of services that will be rendered over the next five years.

155) Even though this disclosure states that Broadstreet can take 30% as upfront fee, Broadstreet never disclosed to Plaintiffs that it did in fact take 30% of their money as a fees.

156) The monthly investor reports sent to Plaintiffs never reflected any fees being deducted from their accounts, and Broadstreet never provided Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

157) Instead, every month Broadstreet provided Plaintiffs with misleading investor reports that made it appear that Plaintiffs' entire capital was invested in the investment that Plaintiffs selected, meanwhile 30%, at a minimum, of Plaintiffs capital never made it to Plaintiffs' selected investment.

158) Through the SEC enforcement action Plaintiffs learned that Broadstreet collected approximately 30% or at least $305.4 million in fees upfront and funneled that money to Feingold, the Baldassarras Brothers and BSG Holdings to support their lavish lifestyles.

159) In addition, less than three years after Broadstreet started having Plaintiffs and its other investors sign the Compliance Acknowledgement Update, Broadstreet is now attempting to get rid of all its investors.

160) Thus, despite collecting five years of fees upfront, Broadstreet is refusing to provide five years of service to many of its investors, including the Plaintiffs.

161) Accordingly, to the extent that Broadstreet collected fees from Plaintiffs for services it did not provide, those fees need to be returned.

**b. Broadstreet Acted As Plaintiffs' Investment Advisor.**

162) Broadstreet also had Plaintiffs acknowledge Paragraph 12, which states: "*I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.*" Yet, at the same time it had Plaintiffs acknowledge Paragraph 7 and 8, which states:

> "7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects."
>
> "8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves."

163) The acknowledgment in Paragraph 12 conflicts with the acknowledgements in Paragraphs 7 and 8. Plaintiffs cannot both make their own investment decisions and give Broadstreet the right to invest Plaintiffs' money however it sees fit.

164) Although Plaintiffs were under the impression that they were making their own investment decision by selecting which of the Broadstreet Series they wanted to invest in, in actuality, Broadstreet decided in its sole discretion how Plaintiffs' funds were used.

165) In fact, in Broadstreet's motion to dismiss the SEC complaint it points to numerous provisions in the Compliance Update and Amendments to the PPM and Operating Agreement which it claims gives it broad powers and discretion to manage, own, and control fund assets. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 301 at ¶¶ 35-38, 48-51.

166) Thus, taking the investment decisions away from Plaintiffs and allowing Broadstreet to have discretionary control over its investments, which also means that Broadstreet

was acting as Plaintiffs' investment advisor and thus owed Plaintiffs the highest fiduciary duty to act in Plaintiffs' best interest.

167) Moreover, Paragraph 8 is even more problematic because it requires Plaintiffs to agree to a Ponzi scheme. Specifically, it requires Plaintiffs to agree that instead of investing their money Broadstreet could give Plaintiffs back their own money as distributions or interest payments or use Plaintiffs' money to pay distributions to other investors.

168) Since a Ponzi scheme is illegal under both federal and state laws, no investor, including Plaintiffs, could legally agree to participate in one.

**X. In 2025 Broadstreet Ran Out of Money to Continue Paying the Guaranteed Distributions.**

169) In 2025 the scheme that Broadstreet had devised to falsely present distributions as profits began to fall apart.

170) Broadstreet and its sales team promised investors guaranteed returns in amounts that varied by investment that were typically around 14% but ranged from 7% to 28% annual returns.

171) However, most of the distributions paid to the Broadstreet investors was money pulled out of the Samson Horus/MCA Series investment.

172) Broadstreet withdrew money from the Samson Horus/MCA Series to pay its investor these guaranteed returns regardless of whether the investors selected the Samson Horus/MCA Series as one of their investments.

173) Broadstreet provided its investors with monthly investor reports representing distributions coming from their particular investment, when in fact as much as 80% of those distributions were being funded by the Broadstreet investors who invested in Samson Horus/MCA Series.

174) The constant depletion of the funds from the Samson Horus/MCA Series forced Broadstreet to liquidate the MCA portfolios in 2025. Broadstreet's mismanagement of the MCA portfolios resulted in a money-in versus money-out loss of approximately $40 million.

175) Indeed, the court appointed Monitor overseeing Broadstreet in the SEC's enforcement action wrote in his Third Status Report issued on July 30, 2025 that unless Broadstreet sold some of its assets, it would not be able to continue making distributions to its investors.

176) Ultimately, with the Samson Horus/MCA Series depleted and 30% of the money raised already siphoned out of the fund, Broadstreet could no longer continue its ruse that its investments were generating money.

177) Thus, Broadstreet devised a new scheme to get rid of all its investors in 2025.

## XI. Feingold's Role in the Scheme.

178) Feingold knew that BSG Fund investors were being paid inflated returns that did not actually represent profits.

179) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus. Feingold had primary responsibility for the management of the MCA portfolios funded by BSG Fund at Samson Horus. Feingold, through BSI, also oversaw the BSG Fund's Infrastructure projects under development by Blackstream Development, LLC and Contender Development, Inc. Feingold knew that the shortfall needed to pay the promised returns to Infrastructure Series investors was to be paid from purported profits on MCA investments.

180) Despite the fact that the MCA portfolio generated little to no profits, Feingold frequently requested cash withdrawals from Samson Horus, which were paid to the Broad Street Entities' bank accounts.

181) Feingold received periodic reports showing the profitability (or lack thereof) of the MCA portfolios that he requested from Samson Horus. Samson Horus prepared a weekly performance report titled "Dave's ROI," meaning David Feingold's return on investment. These weekly reports accumulated factor rates – the percentage return a merchant would have to repay (i.e., a 1.36 factor rate meant that a merchant would have to repay 136% of the amount advanced) – as well as costs, such as origination and management fees, which reduce the amount that the BSG Fund could receive from its MCA investments. Samson Horus used this transaction data to calculate a profit percentage for each MCA portfolio. While certain of the "Dave's ROI" reports state, on their face, a "Year to Date" return on investment, the listed returns are cumulative, which is readily apparent from the reports.

182) Feingold requested, obtained, and reviewed these weekly reports, and extracted information from them to make his own calculation of the average annual return of the MCA portfolios.

183) The data in the "Dave's ROI" reports shows the profitability of the MCA portfolios. Projected profits on open MCA deals were less than 14% annually, and the open MCA deals included accounts in collections and default.

184) Further, the deterioration in the collectability of the MCA portfolios alleged above would have been apparent to Feingold by dividing the cumulative returns shown on the Dave's ROI reports by the age of the portfolios.

185) In addition, Feingold reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

186) Despite knowing the actual performance of the MCA investments, Feingold provided materially overstated MCA performance information to BSG Management and to BSI. This information was incorporated into MCA Series pitch decks and BSG Fund periodic investor updates. These materials were distributed by BSI's staff to certain of BSG Fund's actual and prospective investors.

187) In addition, Feingold was the source of materially overstated MCA performance information that was incorporated into BSG Fund's unaudited consolidated financial statements for fiscal year 2023 and made available to investors upon request.

188) After its formation in June 2022, Feingold acted in his role as chief executive officer of BSI. After that time, the conduct of Feingold is imputed to BSI.

## XII. The Baldassarras' Role in the Scheme.

189) The Baldassarras should have known that BSG Fund investors were being paid inflated returns that did not actually represent profits.

190) BSG Fund's draft unaudited financial statement and income tax returns in 2020 and 2021, all of which were available to Joseph Baldassarra and Steven Baldassarra (which were signed by Steven Baldassarra), reported multi-million-dollar losses to BSG Fund and identified no income attributed to MCA investments. Despite these documents showing losses, substantial sums were paid from the Broad Street Entities' bank accounts (or were rolled over) to BSG Fund investors during at least 2021.

191) In addition, Steven Baldassarra reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

192) Further, the Baldassarras should have known that BSG Management did not create and maintain Series-level financial statements for BSG Fund reflecting the actual profits of each Series, as required by BSG Fund's Offering Materials. The Baldassarras made no effort to determine how the purported profits from MCA investments had been apportioned to the various BSG Fund Series. The Baldassarras authorized, and BSG Management and BSI provided, periodic account statements to investors, including MCA and Infrastructure Series investors, that reported consistent, fixed returns. Specifically, the account statements reflected the principal amount invested less any withdrawals, and earnings based on the investor's promised return (e.g., 14%) multiplied by the account balance. These account statements were not based on actual profits.

193) Despite the above allegations, the Baldassarras authorized, or had the power to authorize, payments to BSG Fund investors. The Baldassarras also authorized, or had the power to authorize, investors rolling over monies that were represented as profits (that the BSG Fund would have otherwise had to pay in cash) into new BSG Fund investments.

194) Further, as managers of the BSG Fund and by reviewing information that went to investors before it was sent out, the Baldassarras should have known that the information being provided by Feingold into the pitch decks, periodic updates, and unaudited financial statements regarding MCA performance, as well as the performance of the BSG Fund overall, was false and misleading.

195) The Baldassarras acted in their role as managers of BSG Management. The conduct of the Baldassarras is imputed to BSG Management.

## XIII. Beginning in March 2025 Broadstreet Initiated Its Scheme to Get Rid of the Investors in the Altcoin Series.

196) Broadstreet raised approximately $416,000,000 from its investors for the Altcoin Series. <u>See</u> Page 16 of the Monitor's Third Status Report in Case 1:25-cv-20436-DPG (S.D. Fla.) at DE 135.

197) Broadstreet investors, including Plaintiffs, executed an Altcoin subscription agreement that promised a 28% annual return through quarterly distributions.

198) However, Plaintiffs received distributions for less than one year before the distributions stopped. And Plaintiffs have not received any distributions from their Altcoin investment since March 2025.

199) Upon information and belief, Broadstreet stopped paying distributions to the Plaintiffs and all the other Altcoin investors because the Altcoin Series was not generating enough income to support the 28% returns that were promised.

200) Indeed, this is not surprising since Broadstreet immediately pocketed 30% of the money raised as fees and paid 28% of the money raised back to the Altcoin investors in Ponzi like fashion. Thus, only about 40% of the money raised ever made it to the Altcoin investment.

201) The assets purchased for the Altcoin Series would have had to generate annual profits of at least 70% just to continue paying the Altcoin investors the 28% annual interest that was promised – and it did not do that.

202) To pay the Altcoin investors 28% annual dividends, the Altcoin Series would have had to generate **<u>$116,480,000</u>** of income annually. However, from January 1, 2025 through May 31, 2025, the BSG Fund had only received a total of **<u>$8,714,034</u>** from crypto mining activity, thus the Altcoin Series could not possibly generate the income needed to pay the Altcoin investors 28% (or $116,480,000) annual dividends.

203) Aware of this problem Feingold and the Baldassarras Brothers concocted a plan to hide the losses from the Altcoin Series (BSG Series CM) by converting it into restricted stock of Z Squared, Inc. through a merger with Coeptis Therapeutics Holdings.

204) Coeptis Therapeutics Holdings was a money-losing biotech company that had nothing to do with crypto asset mining, but it was already a publicly traded company. Thus, by merging with Coeptis Therapeutics Holdings, Z Squared, Inc. could bypass the requirements for becoming a publicly traded company.

205) In addition, Broadstreet convinced one of its employees, David Halabu, to become the CEO of Z Squared, Inc.[2] Thus, Z Squared is controlled by a former employee of Broadstreet. Accordingly, Broadstreet basically created a new company for the sole purpose of transferring away its Altcoin Series investors.

206) Sometime around March 22, 2025, Broadstreet presented the Altcoin investors with a document entitled Altcoin Mining Participant Vote. A copy of the March 22, 2025 Altcoin Mining Participant Vote is attached hereto as **Exhibit E**. This document didn't give the investors an option to vote yes or no. It only had a place for the investors to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

207) Regarding the Z Squared stock conversion, items four through eight in this document states:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.

---

2 David Halabu who was formally a Managing Director at Broadstreet, Inc.

> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.

(Emphasis added).

208) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

209) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including the Plaintiffs, to agree to the sale to the public company.

210) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a

year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

211) In addition, the Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that Plaintiffs did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series.

212) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of the original investment decision and were not fully disclosed before Plaintiffs' consent was solicited in the Altcoin Mining Participant Vote.

213) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including Plaintiffs, into Z Squared restricted stock. Indeed, as of June 1, 2026, the Investor Reports reflect that any investor in the Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

214) Of the Altcoin investors, Akhil Morada, a senior managing director at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares the Altcoin investors received in the transaction.[3] Similarly, Michael Dazzo, another senior

---

[3] The Form S-1 Registration Statement for Z Squared Inc. dated June 9, 2026 lists the total outstanding shares as 51,431,493.

managing director at Broadstreet holds 1,207,311 shares of Z Squared stock through Strategic Business Advisory LLC and Ameritech Global Ventures LLC. Glenn Hechler, the individual who pitched the Altcoin opportunity to the Zimiles, holds 88,033 shares of Z Squared stock, comprising 47,664 held directly and 40,369 through BSGGH LLC.

215) Upon information and belief, Mr. Morada and the others received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

216) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

217) However, this was a false statement because on July 27, 2026, Z Squared Inc. (ZSQR) closed at $4.81 per share, which means the 41,521,276 shares that Broadstreet received as part of the Altcoin conversion would only be worth around $200 million, if they could be traded.

218) But the Z Squared shares aren't even worth that much. As a result of the restrictions on the stock the Altcoin investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027. These restrictions materially impair liquidity and affect the value of the shares received.

219) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors to get them to agree to receiving the stock and to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

220) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

221) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. **Exhibit E**. However, only 9,800 of the 16,000 altcoin machines were transferred from Broadstreet to Z Squared, Inc., and these machines are depreciating assets that become obsolete as new technology emerges.

222) SEC filings by Coeptis in June 2025 said that accounting firm CohnReznick's partners Anthony Doughty and Jake Wright appraised the mining systems in March 2025 at a value of $660 million, or $67,378 per unit. The filings said the valuation had assumed the machines were all Antminer L9 systems when, in fact, 84% of the fleet were L7s—an older, less-powerful system that isn't suited for AI modeling.

223) The $660 million CohnReznick valuation led to Broadstreet investors getting 85% of the merged company's shares when the deal went effective in April2026. A pro forma balance sheet in the merger proxy filing showed that the Broadstreet business had carried the mining systems at only $35.3 million.

224) Z Squared's June-quarter financial statements, filed on August 13, 2026, recorded the mining fleet at a transferred historical carrying amount of approximately $12.4 million, or $1,269 per unit, and a June 30, 2026 net book value of approximately $11.3 million after depreciation.

225) This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation. Broadstreet materially overstated the $600 million value of the Altcoin Series/Z Squared shares, including by relying on valuation assumptions inconsistent with the actual mining fleet.

226) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the

investors receive their entire remuneration and in that document and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce Plaintiffs and the other Altcoin investors to agree to accepting the Z Squared shares.

227) Plaintiffs relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

228) These misrepresentations warrant rescission of this transaction and Plaintiffs should be put back in the same position that they were in before these misrepresentations were made.

229) Accordingly, Plaintiffs should have their capital accounts restored or receive the monetary value thereof as damages including all distributions payments they were entitled to receive since March 2025.

## XIV. Beginning in May 2025 Investors Start Receiving Reports from the Court Appointed Monitor in the SEC Enforcement Action.

230) On January 29, 2025, the Securities and Exchange Commission ("SEC") commenced an action against David J. Feingold, Joseph B. Baldassarra, Steven S. Baldassarra, Broad Street Global Management, LLC, Broad Street, Inc. and others (the "SEC Enforcement Action") Case 1:25-cv-20436-DPG (S.D. Fla.).

231) On April 21, 2025, the court in the SEC Enforcement Action granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Broad Street Global Management, LLC, Broad Street, Inc., Broadstreet Global Fund, LLC, Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Just A Nice Day, Inc., and Josephbenjamin, Inc. (collectively, the "Monitorship Entities").

232) The Monitorship Order, *inter alia*, obligates the Monitor to make recommendations and issue reports regarding the Monitor's assessment of the ongoing operations of the Monitorship Entities.

233) These reports contained valuable information that Broadstreet was hiding from its investors.

## XV. Monitor's First Status Report.

234) The Monitor issued his First Status Report on May 5, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 99. In it the Monitor reported, *inter alia*, that:

> In response to a specific request by the Monitor, the Monitorship Entities also produced 22 spreadsheets of "investor ledgers." Id. at ¶ 17. These ledgers memorialized "dividends" and "return on capital contributions" accrued for the benefit of investors, and whether those "dividends" and "return on capital contributions" were distributed or re-invested at the direction of the investor. Id. The "investor ledgers" did not memorialize management fees deducted from the investors' "equity balances." Id.
>
> As stated above, the Monitor has learned that there are two Internet-based, password protected "data rooms"—one for institutional investors and one for non-institutional investors—through which the Monitorship Entities primarily communicate with their investors. Id. at ¶ 48. The data room for institutional investors includes access to the data room for non-institutional investors.
>
> The Monitorship Entities post informational updates about their projects, including, but not limited to, pitch decks and quarterly updates, to the data rooms. Id. at ¶ 49. The data room for institutional investors includes detailed financial information. Id.
>
> In addition to informational updates, financial information, and quarterly and other reports, the Monitorship Entities post legal documents—including supplements to the private placement memoranda—in the data rooms. Id. at ¶ 50. According to the Monitorship Entities and the private placement memoranda, the posting to the data rooms of these legal documents (including supplements to the private placement memoranda) is sufficient to alter the legal obligations of the parties; unilaterally impose legally binding obligations on the parties; and/or create new benefits for the parties, including as it relates to the amount of fees the Monitorship Entities can collect and when those fees may be collected. Id.

> While the investors are able to read and review the documents and materials posted in the data rooms, a representative for Monitorship Entities confirmed that the default setting is that the investors are *not* able to download or save a copy of the documents and materials posted in the data room. Id. at ¶ 51.
>
> The Monitorship Entities have access to and have produced audit trails for the data rooms. Id. at ¶ 52. Those audit trails show the date and time a document is uploaded into the data room, as well as the dates and times that users accessed documents in the data rooms. Id.
>
> Importantly, the Monitorship Entities also produced approximately 4,035 Compliance Acknowledgment forms, executed by investors across various Series on dates varying throughout 2023, 2024, and 2025. Id. at ¶ 55.
>
> The Monitor has reviewed the "investor ledgers" provided by the Monitorship Entities. Id. at ¶ 56. The "investor ledgers" do not contain a record or accounting of any management fees being deducted from the investors' "equity balances." Id. Further, a Monitorship Entities' representative confirmed that the individual investor ledgers do not reflect "a management fee removal." Id.

## XVI. Monitor's Third Status Report.[4]

235) The Monitor issued his Third Status Report on July 30, 2025. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 135. In it the Monitor reported, *inter alia*, that:

> As of the end of the second quarter of 2025, according to the Monitorship Entities' records, **the balance of the investors' capital accounts across all Series is approximately $633,000,000**. Id. at ¶ 31. **The infrastructure-based Series** comprise more than half of investor funds, **with approximately $239,000,000** invested in the Infrastructure Series **and another $144,000,000** invested into an infrastructure series called BSG15. Id. This balance **does not include** investors in the former MCA, QSBS, **Altcoin** (BSG CM), or TCVI Series. Id. (Emphasis added).
>
> Contender Development, Inc. advised that, through December 31, 2024, only approximately $300,000 in *profits* ever had been realized on any of the infrastructure development projects and that only one project was realizing profits as of June 4, 2025. Id. at ¶ 39.
>
> Feingold is a partner and owner of Contender Development. Id. at footnote 1.

---

[4] The Monitor issued his Second Status Report on May 30, 2025, however the only unredacted portions of that report relate to a dispute over the ownership of assets with another private equity fund, and since those assets are not at issue in this lawsuit the Second Status Report does not need to be addressed here.

In late 2024, BSG Fund wound down/rolled over and discontinued the MCA Series. Id. at ¶ 44. The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15. Id. at ¶ 45. To effectuate the roll over from the MCA Series into BSF15, BSG Fund "credited over" the MCA Series investors' capital accounts to the BSG15 Series. Id. In other words, no actual funds changed hands (or Series) when the discontinuation occurred. Id.

The incoming funds from the historic MCA portfolios to BSG Fund are being used to pay investor dividends across all Series. Id. at ¶ 46.

BSG Fund does not reduce a fund investor's principal balance when management fees are received by BSG Management. Investors are able to redeem the entire amount of their original investment if and when they redeem their investments. *See* S. Baldassarra Feb. 14, 2025 Decl. ¶ 16, ECF No. 54-2. Id. at ¶ 52.

Juniper does not track or report to BSG Fund or the investors the amount of management fees deducted from their investment. Id. at ¶ 53. As a result, both BSG Fund's internal records and the investor-facing records all reflect that all investors' capital accounts contain the amount invested without any reduction for the up to 30% in up front management fees. Id. Moreover, the investors' dividends, which typically are a set percentage of the capital account, are not reduced proportionately to the management fees collected. Id.

BSG Fund does, however, collect--and distribute to its manager/partners--management fees, despite such fees not being reflected on the investor ledgers. Id. at ¶ 54.

When BSG Fund solicited and received investor funds, BSG Fund held "closings" twice a month, on the 1st and 15th, when it would receive and then deploy investor funds. Id. at ¶ 55

From the interview with Steven Baldassarra, the Monitor learned that BSG Fund maintains what it refers to as a "management fee worksheet." Id. at ¶ 56. In essence, with each "closing" (*i.e.*, when investor funds were received historically on the 1st and 15th of each month), Steven Baldassarra calculated how much BSG Fund *could* collect in management fees on a Series-by-Series basis. Id.

At present, according to records provided by the Monitorship Entities, **the investor capital account balances across all Series is approximately $633,000,000**. Id. at ¶ 60. From January 1, 2025 through May 31, 2025, according to Juniper records, BSG Fund paid approximately $75,073,250 in investor dividends. Id.

Based on internal accounting records and bank statements provided by the Monitorship Entitites and reviewed by the Monitor's forensic accountant team, from January 1, 2025, through May 31, 2025, BSG Management, as manager of

> BSG Fund, received a total of approximately $73,955,551 in incoming transfers. Id. at ¶ 61. Of that, approximately $5,012,503, or 6.8% was from Contender Development. Id. Another $8,714,034, or 11.78%, was from crypto mining activity. Id. **The remaining approximately $58,958,667, or 79.7% was from Samson, representing liquidated profits the historic MCA portfolios**. Id.
>
> ***Ultimately, for BSG Fund to be able to meet its dividend obligations going forward, and particularly into 2026, it appears that BSG Fund must begin to receive significantly more revenue from non-MCA sources (such as infrastructure), liquidate certain assets, or sell all or part of its equity in the infrastructure portfolio.***" Id. at ¶ 71

(Emphasis added).

236) Also, on October 7, 2025, the Monitor issued a supplement to the Third Status Report to clarify that on a money in and money out basis the Samson/MCA portfolios were not profitable and in fact "from 2019 through mid-2025, [Broadstreet] sent at least $40 million more to Samson than [Broadstreet] have received from Samson." See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 140. Thus, the Samson/MCA Series resulted in a $40 million loss.

## XVII. Monitor's Fourth Status Report.

237) The Monitor issued his Fourth Status Report on October 30, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 165. In it the Monitor reported, *inter alia*, that:

> As of the filing of the Third Status Report, the Monitor was operating under incorrect impression that the incoming funds from Samson represented "profits" on a money in/money out basis. Id. at ¶ 27. In other words, the Monitor was led to believe that, from the beginning of time, the Monitorship Entities had sent more money to Samson to be invested in the MCA portfolio than it had received from Samson, and thus the current funds being received from Samson represented "profits." Id.
>
> The Monitor later learned that the Monitorship Entities did not provide the Monitor with the actual funds "received" from Samson, as the Monitor had requested. Id. at ¶ 28. Rather, the Monitorship Entities provided the Monitor with "right to receive" or "RTR" figures – which are projected, best-case scenario figures that assume all accounts receivable are collected. Id. The Monitor thus filed a Supplement to the Third Status Report retracting his statement about the profitability of the MCA portfolio. Id.

> Therein, the Monitor reported that, as of October 3, 2025, when the Monitor finally received a draft accounting from the Monitorship Entities of the money in and money out for the years 2019 through 2022, the updated accounting reveals that, from 2019 through mid-2025, the Monitorship Entities sent at least $40 million *more* to Samson than the Monitorship Entities have received from Samson. Id. at ¶ 29.
>
> In the time leading up to and following the publishing of the Supplement, the Monitor has continued his efforts to evaluate what exactly the incoming funds from Samson represent – both from an accounting standpoint and from a factual standpoint. The issue remains highly significant to the Monitor given (i) the amount of funds BSG Fund has received (and continues to receive) from Samson relative to the total amount of other funds BSG Fund receives; and (ii) BSG Fund's current monthly dividend obligations to investors. Id. at ¶ 30.
>
> As such, the Monitor stands by his position, as reported in the Supplement to the Third Status Report. … The Monitor is merely saying that, on a macro-level, money in/money out basis, there remains a $40 million deficiency over the life of the MCA portfolio. Id. at ¶ 34.
>
> Based on internal accounting records and bank statements provided by the Monitorship Entities and reviewed by the Monitor's forensic accountant team, from June 1, 2025 through September 30, 2025, BSGM, as manager of BSG Fund, received a total of approximately $93,419,429 in incoming transfers. Id. at ¶ 38. Of that, approximately $38,690,884 or 41.4%, was received from Samson (on account of the current liquidation of the MCA portfolio). Id. Another $13,053,650, or 14%, was received on account of infrastructure income. Id. $2,784770, or 3.0% was received on account of mining equipment rental income. Id. Approximately $509,180, or .5% represented interest. And $37,515,520.36, or 38.1%, represented deposits that have not been identifies. Id.
>
> From January 1 to May 31, 2025, the vast majority of funds being used to pay investor dividends came from the BSG Fund's liquidation of the MCA portfolio, and the Monitor was aware that the stream of funds would taper off in the first quarter of 2026 … (reporting that the MCA portfolios "will be fully liquidated by the beginning of 2026." Id. at ¶ 41.

## XVIII. Broadstreet Initiated Its Scheme to Get Rid of its Remaining Investors in November 2025 by Issuing a Redemption Notice.

238) On November 13, 2025, a Zoom meeting was held for Broadstreet investors, where David Feingold discussed the redemption process and the proposed public company or SPAC transaction.

239) Feingold said the decision was driven by the fact that he was getting older, there needed to be a succession plan for when he's not able to run the company anymore and he thought handing over the investors to a startup company ran by young people was in everyone's best interest.

240) Feingold said that he demanded that Soulpower Acquisition Corporation make him the largest shareholder of SOUL stock.

241) Feingold said that he demanded that Soulpower Acquisition Corporation make all the shares restricted, including any shares he received. Feingold said that the "biggest shareholders should be more restricted than everyone else."

242) Feingold said that Soulpower Acquisition Corporation agreed to his demands.

243) Feingold said that as a result, he received 75 million shares of SOUL. Feingold said it is a big pay day for him if he does what he knows in his heart he is going to achieve.

244) Feingold went on to say that the average Broadstreet investor has been with Broadstreet about three years, and in three years Broadstreet is able to get its investors their capital back where other private equity firms take seven years. Feingold said "that's called not being average"

245) Feingold further said "At some point you are going to get a Redemption Notice. I mean this with all sincerity. **Whether you pick Option A or Option B. That's up to you**. Go talk to as many lawyers, accountants, whoever. **That's your decision**."

246) No questions were allowed during this Zoom meeting. But Feingold went over a list of pre-populated questions.

247) The next day, November 14, 2025, Broadstreet sent its investors the Redemption Notice via Docusign.[5]

## XIX. Broadstreet's July 27, 2026 Investor Update.

248) On July 27, 2026, Broadstreet issued an update to its investors regarding the final phase of redemption. See **Exhibit F**. In this letter Broadstreet states:

> The two exit transactions include: (a) the sale of our technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion based on valuation. Considering that our invested capital was approximately $1.2 billion, that yields a profit of $2.4 billion and a 3x multiple on invested capital based on valuation.

249) Yet, in footnote 2, Broadstreet admits that it is using "Manager discretion in determining value." In other words, Broadstreet is making these numbers up.

250) A thing is only worth what someone is willing to pay for it. Since these shares are restricted, they are essentially worthless.

251) Moreover, the calculated values of the infrastructure projects Broadstreet provided its investors in November 2025 claims that the total gross revenue (before expenses) for these projects adds up to $2.25 billion, not $3 billion. They arrive at these numbers by claiming that some of these infrastructure projects will generate gross revenue more than 25 times the project's appraised value. That is an incredible return, one that is not supported by the historical returns of any of Broadstreet's completed infrastructure projects.

252) Broadstreet's valuation of the assets in Altcoin/Z Squared transactions suffers from the same over valuation concerns.

---

[5] Initially, Broadstreet sent its investors a Redemption Notice via Docusign on or about October 24, 2025. However, at the behest of the Monitor, Broadstreet resent the redemption notice on November 14, 2025 with more information.

253) Thus, Broadstreet is falsely claiming that it sold two of its business divisions for stock in publicly traded companies on the NASDAQ and NYSE for a combined value of $3.6 billion.

254) Again, why is Broadstreet inflating the value of these shares, so that it can fraudulently claim that it is entitled to keep the over $500 million in assets acquired with its investors' capital.

255) Accordingly, the update letters Broadstreet keeps sending to its investors are part of the fraud they are committing.

**XX. The Plaintiffs and Representations Broadstreet Employees Made Directly to Them.**

256) Edlene Zimiles and Andrei Zimiles are a married couple who invested a significant portion of their life savings in the BSG Fund. Andrei Zimiles is the trustee of the Andrei Zimiles Revocable Living Trust (the "Trust") and personally handled its Altcoin investment.

257) In March 2024, Glenn Hechler, their contact for Broadstreet transactions, called them to recommend that they invest in the Altcoin Series in BSG Fund. Mr. Hechler provided them with the pitch deck for this investment, which stated that there was a 6-month redemption period.

258) On March 7, 2024, Andrei Zimiles sent Mr. Hechler an email with eleven questions about the altcoin mining opportunity to conduct his due diligence on this investment, which Mr. Hechler answered during a phone call.

259) On April 13, 2024, the BSG Fund entered into side agreements with Edlene Zimiles and the Trust to induce them to invest in the Altcoin Series. In these agreements, the BSG Fund agreed that:

a. The Investor shall be paid an annual return of 28% (the "Return") which shall be made in equal quarterly payments and is to be made as a preferred return meaning before other payments as described hereafter. Each quarterly payment of the Return is to be paid before any management, performance, or expenses are paid for the quarter. In addition, there will be no capital calls for investors.

b. In the event the business is sold, the investor shall receive the percentage of purchase price based on the percentage amount of capital that the investor invested in comparison to the total sum raised by the fund for this sub-series.

c. The Payment is being made from returns achieved by BSG in the investment of the Investor's funds as provided in the private placement documents of BSG related to the altcoin mining subseries and as reflected in the data room of BSG.

260) The Side Letter Agreements were counter-signed by Steven Baldassarra as Managing Member.

261) Edlene subscribed $50,000 and the Trust subscribed $100,000, with a second tranche (Edlene a further $20,000 on October 29, 2024; the Trust a further $200,000 on November 14, 2024), for Altcoin totals of $70,000 and $300,000, respectively.

262) In March 2025, Broadstreet sent Edlene Zimiles and the Trust the Altcoin Mining Participant Vote agreement discussing a potential sale of the Altcoin investment to a publicly traded company. This document suggested that they might receive cash in exchange for their ownership interest in the Altcoin Series, although it stated that all consideration was "expected" to be paid in stock. Clause 8 referred conditionally to "In the event" the transaction was "stock rather than cash," and clause 11 repeated "if stock is the consideration paid." It also stated that if stock is

received rather than cash, management may negotiate a stock lock up period to protect the stock price of any acquiring entity.

263) The Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that Edlene Zimiles and the Trust did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series. Had this missing information been disclosed, they would not have signed the Altcoin Mining Participant Vote.

264) The Altcoin Series (BSG Series CM) was converted into restricted stock of Z Squared, Inc. through an asset-for-share exchange and a merger with Coeptis Therapeutics Holdings. Coeptis, CP Merger Sub, and Z Squared signed their merger agreement on April 25, 2025. The governing Asset-for-Share Exchange Agreement between pre-merger Z Squared (now Z Squared OpCo Inc.) and BSG Series CM exists in three versions on EDGAR (accession 0001683168-26-003388, CIK 0001759186): the June 24, 2025 Amended and Restated agreement set 40,446,956 OpCo shares at $16.00, with a VWAP lock-up, an 18-month leak-out, and a $35.00 two-consecutive-trading-day suspension; the February 10, 2026 First Amendment restated the consideration to 44,062,947 OpCo shares at $16.31; and the April 23, 2026 Second Amendment extended the lock-up, leak-out, and the $35.00 trigger to transferees.

265) The Form S-4 registration (Reg. No. 333-288329) was declared effective in late December 2025. The Coeptis-Z Squared merger closed April 24, 2026; the ticker changed from COEP to ZSQR. On April 27, 2026, restricted ZSQR shares were issued to BSG Series CM

members in book-entry form at Continental Stock Transfer, and the 18-month leak-out began. BSG Series CM subsequently reported a pro-rata distribution of all 41,521,276 ZSQR shares to its members on April 30, 2026, in a Form 4 and a Schedule 13D/A signed by Steven Baldassarra.

266) The specific allocations of Edlene Zimiles and the Trust, as confirmed by Continental, were as follows: Edlene received 8,175 restricted ZSQR shares (account 927), and the Andrei Zimiles Revocable Living Trust received 31,440 (account 535). Both Edlene's and the Trust's original confirmations (each bearing Advice 2032972, for accounts 927 and 535, respectively) carried restriction code C180E with a legend tying the restriction to the June 24, 2025 agreement while quoting a $16.31 VWAP; a corrected confirmation (Advice 2039835) for the Trust replaced it with codes C180G (the S-4 leak-out and lock-up, terminating October 27, 2027) and C180H (a Rule 144 legend).

267) Between April 29 and May 15, 2026, Edlene Zimiles and Andrei Zimiles questioned the $16.31-versus-$16.00 legend and the meaning of code C180E. Continental's Chief Compliance Officer, Michael Mullings, explained that a statutory Securities Act restriction applied on top of the contractual lock-up and leak-out and that a corrected statement and explanatory letter would issue; their registered address was also updated. A Z Squared Shareholder Update dated May 13, 2026 described the two restriction legends, a no-shorting policy, the leak-out (one-eighteenth per month above a $16.00 VWAP, capped at 5% of average daily volume, with the $35.00 two-day override), the Form S-4, and a forthcoming Form S-1 resale registration, with the restrictions under that agreement expiring October 27, 2027. The same notice contained an express threat: “Any investor found to be in violation of the no shorting policy or the Leak-Out Agreement will have their account frozen at the transfer agent level and will be referred to the SEC and FINRA for further investigation and enforcement action.” It added: “These consequences are serious and

irreversible. Please govern accordingly.” The notice was signed by Z Squared Inc. and was sent to Andrei Zimiles by Continental with his book-entry confirmation on May 15, 2026. Selling-stockholder questionnaires were executed for the Trust (April 17, 2026) and Edlene (May 7, 2026).

268) BSG Series CM reported the distribution on a Schedule 13D/A and a Form 4 as “pro rata.” The company's public filings explain that BSG received 44,062,947 shares of the pre-merger Z Squared entity (now OpCo), which were converted in the merger into 41,521,276 shares of the public company's common stock. That explanation reconciles the aggregate share counts; it does not establish that Edlene Zimiles's and the Trust's individual allocations were accurate or that they received the proportional share of sale proceeds promised in their side letters. Edlene Zimiles and the Trust dispute that the distribution satisfied those obligations and seek a full accounting of how the consideration was valued and allocated, including any consideration allocated to Broadstreet or its affiliates. Merely describing the distribution as “pro rata” does not demonstrate that they received what they were owed.

269) The First Amendment changed the lock-up threshold from $16.00 to $16.31. The original book-entry legends for Edlene Zimiles and the Trust tied the restriction to the June 24, 2025 agreement while quoting a $16.31 VWAP, and a corrected statement had to be reissued with different codes. Z Squared's May 13, 2026 Shareholder Update nevertheless stated a $16.00 VWAP threshold. Accurate cost-basis and restriction disclosure matters under the antifraud provisions and is necessary for accurate tax reporting; the need for a correction is consistent with the SEC's allegation that Broadstreet made false statements about recordkeeping and financial statements. These inconsistencies are particularly troubling given the express threat of account freezes and regulatory referrals for noncompliance.

270) The ZSQR shares held by Edlene Zimiles and the Trust are restricted securities under lock-up and leak-out terms and Rule 144 legends, with resale governed by the S-4 (Reg. No. 333-288329) and a Form S-1 (Reg. No. 333-296653) declared effective on June 16, 2026, subject to the continuing contractual lock-up and leak-out restrictions. As of the date of this declaration, neither Edlene nor the Trust has sold any of the ZSQR shares received in connection with their Altcoin investments. If unregistered, non-exempt securities were sold, Section 12(a)(1) gives a purchaser a rescission remedy against the seller; misstatements in a registered offering can implicate Section 12(a)(2).

271) The side letters promised a 28% preferred annual return and pro-rata participation in sale proceeds. Converting the position into restricted stock locked up to October 27, 2027, with no preferred-return cash and constrained liquidity, appears to defeat those bargained-for economic terms, and thus is a breach of the terms of the side letter agreement. The side letters were counter-signed by Steven Baldassarra, tying the breach to the controlling individuals.

272) Converting investors into a single restricted, thinly traded post-merger stock raises loyalty, care, suitability, and disclosure concerns, especially given irregular and inconsistent communications regarding share count, cost basis, and the restrictions on Edlene Zimiles's and the Trust's shares.

273) The investment sold to Edlene Zimiles and the Trust was a family of Altcoin Mining investments with a 28% preferred annual return, payable quarterly, no capital calls, depreciation benefits, and defined economics on sale. The Z Squared conversion is a pivot from their original investment, and thus it is not the investment they bought.

274) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent

process, and downside/liquidity risk were not part of Edlene Zimiles's and the Trust's original investment decision and were not fully disclosed before their consent was solicited.

275) If Broadstreet relies on the sale vote, that document still points to a stated expected economic outcome: investment back plus 100% for pre-May 2024 capital and investment back plus 50% for later capital (200% and 150% of invested capital, respectively), with Broadstreet/affiliates paid only after investors receive their entire remuneration. The vote reinforced those value representations by stating: “All investors are expected to receive stock at a value higher than their original investment if stock is the consideration paid.” Restricted shares that cannot be freely sold at that value are not the same as cash purchase price or promised remuneration. The restrictions limited Edlene Zimiles's and the Trust's ability to realize those stated values through a sale of the shares. The fact that the vote contemplated stock consideration does not establish that the shares actually delivered provided the value represented.

276) The Selling-stockholder questionnaires, Oppenheimer instructions, holder representation letters, and transfer-agent documents were steps taken to mitigate losses in connection with the announced or completed Z Squared transaction and were not intended by Andrei Zimiles as consent to give up the side letter agreement or sale-value rights.

277) For these reasons, Edlene Zimiles and the Andrei Zimiles Revocable Living Trust seek to rescind the Z Squared conversion of their Altcoin Series investment and seek other available relief, including restitution, damages, and an accounting, in the alternative where necessary.

278) Details of the specific representations Broadstreet and Glenn Hechler made can be found in the Declaration of Andrei Zimiles attached hereto as **Exhibit H**.

## CLAIMS FOR RELIEF

**COUNT I**
**BREACH OF CONTRACT**
**(April 13, 2024 Side Letter Agreements)**
**Plaintiffs v. Defendants**

279) The proponents of this cause of action repeat and reallege paragraphs 1-278.

280) The April 13, 2024 Side Letter Agreements constitutes a legally binding and enforceable contract between the Zimiles and the BSG Fund. See **Exhibit G**.

281) The BSG Fund breached its material obligations under the April 13, 2024 Side Letter Agreements as a result of, among other things, (i) failing to continue paying Plaintiffs an annual return of 28% in equal quarterly payments to be made as a preferred return to be paid before any management, performance, or expenses are paid for the quarter, (ii) failing to pay Plaintiffs the amount owed pursuant to the April 13, 2024 Side Letter Agreements in the event that the business is sold, and (iii) failing to make distribution payments to Plaintiffs from the returns achieved from the altcoin mining subseries.

282) All of Plaintiffs' material obligations under the April 13, 2024 Side Letter Agreements have been performed or waived.

283) As a direct and proximate result of the BSG Fund's material breach of the April 13, 2024 Side Letter Agreements, Plaintiffs have suffered damages in an amount to be determined at trial.

284) Accordingly, Defendants are liable to Plaintiffs for breach of contract and owe Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT II**
**<u>BREACH OF CONTRACT</u>**
**(The Operating Agreement and "In-Kind" Redemptions)**
**Plaintiffs v. Defendants**

285) The proponents of this cause of action repeat and reallege paragraphs 1-278.

286) This Count is pleaded in the alternative to Count I.

287) The highly speculative, illiquid and restrictive ZSQR stock that Defendants want to force on Plaintiffs is not an "in-kind" redemption under the Operating Agreement.

288) Plaintiffs are a party to the Operating Agreement for the BSG Fund with Defendants. Section 6.03 of the Operating Agreement governs situations such as this where the Manager decides on its own to redeem a member's capital account, and provides:

> <u>Section 6.03 Required Withdrawals</u>. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior **<u>written notice of a termination of all or any portion of such Member's Capital Account</u>**. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice shall receive the **<u>fair value</u>** of its Capital Account in connection with its withdrawal.

(Emphasis added).

289) Since Defendants claim they are exercising their right to force an "in-kind" redemption on Plaintiff, said "in-kind" redemption would have to be made pursuant to the Required Withdrawals provisions of Section 6.03, which requires that Plaintiffs must receive the **<u>fair value</u>** of their capital accounts. Because the speculative, illiquid and restricted shares of ZSQR that Defendants seek to force on Plaintiffs as an "in-kind" redemption have no readily ascertainable market value, their forced imposition on Plaintiffs does not reflects the fair value of Plaintiffs'

capital accounts and thus cannot serve as consideration for a Required Withdrawal.

290) As the SEC stated in a September 2026 filing, Broadstreet "does not have the power to redeem investors with anything it wants, like bags or rocks."

291) Defendants have breached the Operating Agreement by forcing Plaintiffs to accept restricted shares of ZSQR as an "in-kind" redemption that is not equal to the fair value of their capital accounts and does not satisfy the legal requirements of an in-kind redemption.

292) Plaintiffs have been damaged as a result.

293) Accordingly, Defendants are liable to Plaintiffs for breach of contract and owe Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT III**
**CONVERSION**
**Plaintiffs v. Defendants**

294) The proponents of this cause of action repeat and reallege paragraphs 1-278.

295) The Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over hundreds of thousands of dollars belonging to the Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

296) The Plaintiffs have a superior right of possession of the monies and assets held in these investments.

297) Plaintiffs have invested **$370,000.00** in the BSG Fund ("**Converted Monies**").

298) Plaintiffs' investment provided them with ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Crypto/Altcoin Mining - 28% Annual Return

("**Converted Assets**").

299) Nonetheless, the Defendants continue to exercise unauthorized dominion over Plaintiffs' investments to the exclusion and in defiance of the lawful rights of the Plaintiffs to such investments.

300) Defendants have actively blocked Plaintiffs from receiving distributions owed to them from their investments in the BSG Fund.

301) Defendants have or are actively trying to transfer the Converted Assets and Converted Monies to themselves and/or third parties to permanently deprive Plaintiffs access to their investments.

302) The Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Defendants are forcing on Plaintiffs as an alleged "in-kind" redemption, to steal the assets acquired with Plaintiffs' monies.

303) Plaintiffs requested the return of the Converted Monies from Defendants in the civil theft demand letter attached as **Exhibit A** and they have refused to return it.

304) As a result of these illegal distributions, thousands of dollars have been stolen from the Plaintiffs.

305) The Defendants wrongfully assert dominion over the Converted Assets and Converted Monies in a manner that is inconsistent with the Plaintiffs' rights to own and possess the Converted Assets and Converted Monies.

306) Defendants' wrongful assertion of dominion over the Converted Assets and Converted Monies deprives the Plaintiffs of their right to own and possess the Converted Assets and Converted Monies.

307) The Plaintiffs have been damaged as a proximate and direct result of Defendants' conversion of Plaintiffs contributions to the BSG Fund. The Plaintiffs have been deprived of the reasonable rates of return that they otherwise would have earned.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the Defendants granting all damages and other available relief under applicable law.

**COUNT IV**
**CIVIL THEFT**
**Plaintiffs v. Defendants**

308) The proponents of this cause of action repeat and reallege paragraphs 1-278.

309) The Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over hundreds of thousands of dollars belonging to the Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

310) Plaintiffs have a superior right of possession of the monies and assets held in these investments.

311) Plaintiffs have invested **$370,000.00** in the BSG Fund ("**Stolen Monies**").

312) Plaintiffs' investment provided them with an ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Crypto/Altcoin Mining - 28% Annual Return

("**Stolen Assets**").

313) The Defendants knowingly obtained or used, or endeavored to obtain or use, the Stolen Monies and Stolen Assets.

314) The Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Defendants are forcing on Plaintiffs as an alleged "in-kind" redemption, to steal the assets acquired with Plaintiffs' monies.

315) The Defendants' actions were intended to permanently deprive the Plaintiffs of their rights to, and the benefits from, the Stolen Assets and Stolen Monies.

316) The Defendants' actions were intended to appropriate the Stolen Assets and Stolen Monies for the Defendants' own use.

317) Pursuant to Florida Statute § 772.11, Plaintiffs sent Defendants a letter demanding the return of the Stolen Monies to no avail. See **Exhibit A**.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against Defendants granting all damages including, but not limited to, compensatory damages, treble damages, interest, attorneys' fees and court costs pursuant to Florida Statute § 772.11 and any other available relief under applicable law.

**COUNT V**
**BREACH OF CONTRACT**
**(Altcoin Mining Participant Vote)**
**Plaintiffs v. Defendants**

318) The proponents of this cause of action repeat and reallege paragraphs 1-278.

319) This Count is pleaded in the alternative to Count VI.

320) Sometime around March 22, 2025, Broadstreet presented Plaintiffs with a document entitled Altcoin Mining Participant Vote (**Exhibit E**). This document didn't give Plaintiffs an option to vote yes or no. It only had a place for Plaintiffs to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

321) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we

> believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

322) Pursuant to Section 11.04 of the Operating Agreement, the Altcoin Mining Participant Vote is an amendment to and supersedes the Operating Agreement. As required by Section 11.04, the Altcoin Mining Participant Vote provides members of the BSG Fund, including Plaintiffs, "**notice**" about a change to their rights under the Operating Agreement and Altcoin Series Schedule, and it requires the members to **consent** to the change. The Altcoin Mining Participant Vote is the manner in which the Manager of the BSG Fund chose to amend the Operating Agreement for the Altcoin Series. Accordingly, the Altcoin Mining Participant Vote is

an amendment to the Operating Agreement and thus a binding contract between Plaintiffs and Defendants.

323) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment (depending on when the investor invested in the Altcoin Series).

324) Of the Broadstreet investors, Akhil Morada, a Partner at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

325) Also, upon information and belief, Broadstreet and its affiliates have paid themselves at least 30% of the money that was supposed to be allocated for the Altcoin Series.

326) Meanwhile, Plaintiffs who invested in the Altcoin Series, have not been repaid their full investment plus either 100% or 50% of their investment (depending on which investment Plaintiffs made in the Altcoin Series).

327) The restricted Z Squared shares that Defendants purport to provide Plaintiffs as an "in-kind" redemption have no known value.

328) These payments to Akhil Morada, Broadstreet and its affiliates were made in breach of the Altcoin Mining Participation Vote that Broadstreet had Plaintiffs sign, and thus Plaintiffs have sustained significant damages from the dilution of any potential value of the Z Squared shares they received as an "in-kind" redemption.

329) Accordingly, Defendants are liable to Plaintiffs for breach of contract and owe Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT VI**
**FRAUD IN THE INDUCEMENT**
**(Altcoin Mining Participant Vote)**
**Plaintiffs v. Defendants**

330) The proponents of this cause of action repeat and reallege paragraphs 1-278.

331) The Defendants fraudulently induced Plaintiffs to convert their ownership interest in the Altcoin Series into shares of Z Squared, Inc.

332) Sometime around March 22, 2025, Broadstreet presented Plaintiffs with a document entitled Altcoin Mining Participant Vote (**Exhibit D**) for them to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

333) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.

> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

334) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

335) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including Plaintiffs, to agree to the sale to the public company.

336) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

337) Broadstreet was fully aware of what funds it had allocated to the Altcoin Series and how much the acquired assets were generating. Therefore, Broadstreet knew that they had no basis

for representing to the Altcoin investors that they would receive their investment back plus an additional 100% or 50% of their investment in the March 22, 2025 Altcoin Mining Participant Vote. Broadstreet made these fraudulent statements to induce Plaintiffs and other investors in the Altcoin Series to agree to the Altcoin Mining Participant Vote.

338) In addition, the Altcoin Mining Participant Vote did not disclose which company the Altcoin Series was being sold to, did not disclose any details about the stock lock up period that management was considering, and did not provide an option for investors in the Altcoin Series to receive a cash redemption if a stock redemption was ultimately chosen by management. Thus, material information was missing from the Altcoin Mining Participation Vote, such that Plaintiffs did not have adequate information to provide informed consent to the sale of their ownership interest in the Altcoin Series.

339) The actual identity of Z Squared/Coeptis, valuation methodology, share-count formula, lock-up/leak-out mechanics, Rule 144 restrictions, VWAP gates, broker/transfer-agent process, and downside/liquidity risk were not part of the original investment decision and were not fully disclosed before Plaintiffs' consent was solicited in the Altcoin Mining Participant Vote.

340) Had this missing information been disclosed, Plaintiffs would not have signed the Altcoin Mining Participant Vote.

341) Broadstreet continued to make fraudulent statements to Plaintiffs and the other Altcoin Series investors even after the Altcoin Mining Participant Vote.

342) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including Plaintiffs, into Z Squared restricted stock. Indeed, as of June 1, 2026, Plaintiffs' monthly investor reports reflect that its Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

343) Of the Broadstreet investors, Akhil Morada, a senior managing director at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

344) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

345) However, this was a false statement because on July 27, 2026, Z Squared Inc. (stock ticker "ZSQR") closed at $4.81 per share, which means the 41,521,276 that Broadstreet and its investors received as part of the Altcoin Series conversion would only be worth around $200 million, if they could be trades.

346) But the Z Squared shares aren't even worth that much. Due to the restrictions on the Z Squared shares that the Altcoin investors are supposed to receive, the investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027. These restrictions materially impair liquidity and affect the value of the shares received.

347) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors (i) to get them to agree to receiving the stock, and (ii) to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

348) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

349) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. However, only 9,800 of the 16,000 altcoin machines were transferred from Broadstreet to Z Squared, Inc., and these machines are depreciating assets that become obsolete as new technology emerges.

350) SEC filings by Coeptis in June 2025 said that accounting firm CohnReznick's partners Anthony Doughty and Jake Wright appraised the mining systems in March 2025 at a value of $660 million, or $67,378 per unit. The filings said the valuation had assumed the machines were all Antminer L9 systems when, in fact, 84% of the fleet were L7s—an older, less-powerful system that isn't suited for AI modeling.

351) The $660 million CohnReznick valuation led to Broadstreet investors getting 85% of the merged company's shares when the deal went effective in April2026. A pro forma balance sheet in the merger proxy filing showed that the Broadstreet business had carried the mining systems at only $35.3 million.

352) Z Squared's June-quarter financial statements filed on August 13, 2026, recorded the mining fleet at a transferred historical carrying amount of approximately $12.4 million, or $1,296 per unit, and a June 30, 2026 net book value of approximately $11.3 million after depreciation.

353) This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation. Broadstreet materially overstated the $600 million value of the Altcoin Series/Z Squared shares, including by relying on valuation assumptions inconsistent with the actual mining fleet.

354) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the

investors receive their entire remuneration, and in that document and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce Plaintiffs and the other Altcoin investors to agree to accepting the Z Squared shares.

355) Plaintiffs relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

356) These misrepresentations warrant rescission of this transaction and Plaintiffs should be put back in the same position that they were in before these misrepresentations were made.

357) Accordingly, Defendants are liable to Plaintiffs for fraud, and Plaintiffs should have their Altcoin Series investment restored, or receive the monetary value thereof as damages including all distributions payments they were entitled to receive since March 2025.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, rescissionary damages, interest (including missed distribution payments), costs and such other relief as the Court deems appropriate and just.

**COUNT VII**
**FRAUD**
**Plaintiffs v. Defendants**

358) The proponents of this cause of action repeat and reallege paragraphs 1-278.

359) Defendants have perpetrated numerous frauds on Plaintiffs that are continuous and ongoing.

360) Broadstreet provided Plaintiffs with monthly investor reports that made it appear that the distributions they received came from the investment that Plaintiffs selected when that was not the case.

361) These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money Plaintiffs allocated to a particular investment Series made it to that investment, when in fact 30% of the funds Plaintiffs provided for their selected investment was immediately stripped out as fees.

362) While Broadstreet disclosed that it **could** pay itself as much as 30% of the money raised as fees, Broadstreet never disclosed to Plaintiffs that it **did** take 30% of the money received from Plaintiffs as fees. Instead, Broadstreet provided Plaintiffs with monthly investor reports that did not reflect any fees being paid.

363) Broadstreet also never provided Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

364) Through the monthly investor report Broadstreet falsely portrayed distributions to Plaintiffs as profits when in fact Broadstreet was actual funding these distributions through either a return of the Plaintiffs' own capital or using funds from new investors to pay later investors.

365) Broadstreet provided Plaintiffs with misleading monthly investor reports to fraudulently induce Plaintiffs to keep their funds invested in the BSG Fund. Had these investor reports not been misleading, Plaintiffs would have immediately requested to withdraw their funds.

366) Defendant David Feingold did not disclose to Plaintiffs that he was receiving additional compensation out of the money raised from investors for the BSG Fund, above and beyond the 30% Broadstreet was collecting as fees, from side deals he had with some of the companies the BSG Fund was investing in, including, but not limited to Samson Horus, Contender Development and Durham Homes.

367) Broadstreet represented in its Quarterly Reports that it owned assets that it did not actually own, including but not limited to, a Raleigh, NC-TownPlace Suites as one of its hotel projects.

368) Defendants are fraudulently misrepresenting the value of speculative, illiquid and restricted share of Z Squared Inc. that it is forcing its investors, including Plaintiffs, to accept as an “in-kind’ redemption.

369) On July27, 2026, in an investor update letter, Broadstreet fraudulently represented to Plaintiffs that these two exit transactions: (a) the sale of the technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion with absolutely nothing that supports those valuation.

370) Defendants made these fraudulent misrepresentations regarding the value of these two transactions in order to (i) get the BSG Fund investors to agree to accepting theses shares as a “in-kind” stock redemption, (ii) hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the distributions paid to the BSG Fund investors was their own money being paid back to them in Ponzi-like fashion, and (iii) keep for themselves the BSG Fund’s remaining assets (not involved in these two transactions) that were acquired with over $500 million of investor assets for themselves.

371) Plaintiffs relied on these misrepresentations when making their investment decisions to their detriment and have been damaged as a result.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the

assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**Plaintiffs v. Defendants**

372) The proponents of this cause of action repeat and reallege paragraphs 1-278.

373) As manager or as the de facto manager of the BSG Fund, Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra owe members of the BSG Fund, including Plaintiffs, the basic fiduciary duties of care and loyalty, which includes good faith, oversight and disclosure.

374) Moreover, Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra took discretion when making investment decisions for the BSG Fund and in determining how the funds raised for the BSG Fund would be deployed. Often disregarding the investment Series selected by the BSG Fund investor for their investment in the fund. Thus, they acted as investment advisors to the BSG Fund and its members with the highest fiduciary duty to act in the BSG Fund and its members' best interest, which includes a duty to avoid conflicts of interest.

375) In the investment advisory and broker/customer relationship with Plaintiffs, Defendants were under a fiduciary duty to:

a. recommend investments only after studying them sufficiently to become informed as to their nature, price and financial prognosis;

b. refrain from self-dealing;

c. inform the customer of the risks involved in purchasing and selling a security;

d. perform orders promptly and in a manner to serve the customer's best interest;

e. transact business only after receiving approval from the customer; and

f. not to misrepresent any material fact to a transaction.

376) Defendants owed these fiduciary duties to Plaintiffs, and breached their fiduciary duties as set out above.

377) At all times herein, Defendants acted in the capacity of agent and fiduciary custodian for Plaintiffs. This fiduciary relationship arose out of Defendants holding themselves and their agents out as investment advisors and accepting compensation for their services, the Defendants' superior knowledge and experience regarding securities and investments, and the representations made by Defendants to Plaintiffs in regard to the investments.

378) Acting in these capacities, Defendants owed Plaintiffs the fiduciary duties of good faith, fair dealing, trust, and integrity in their dealings with Defendants and in their maintenance of the investments, supervision of the investments, and recommendations regarding the investments. Defendants also owed the Plaintiffs the duty not to self-deal and to supervise and prevent self-dealing by their agent. Said duties were breached by Defendants and their agent by their action and inaction set out herein.

379) For instance, Defendants recommend, and arguably forced, the ZSQR shares to Plaintiffs even though this investment was unsuitable for Plaintiffs' investment objectives and risk tolerance.

380) Defendants pushed this investment on the BSG Fund investors, including Plaintiffs, so that Defendants could keep for themselves assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

381) In doing so, Defendants breached the fiduciary duty to act in the BSG Fund and its members' best interest, to refrain from self-dealing, to avoid conflicts of interest and to be loyal.

382) Defendants also misrepresented the value of ZSQR shares the BSG Fund investors would be receiving in violation of their duty to not to misrepresent any material fact to a transaction and to inform the customer of the risks involved in purchasing and selling a security.

383) As a direct and proximate result of Defendants' aforesaid conduct and breaches of fiduciary duties, Plaintiffs incurred damages of at least **$370,000.00**.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT IX**
**DISGORGEMENT**
**Plaintiffs v. Defendants**

384) The proponents of this cause of action repeat and reallege paragraphs 1-278.

385) Every time Plaintiffs invested in a BSG Fund investment Series, Broadstreet immediately collected 30% of the funds as fees for services it promised to provide over the next five years.

386) Broadstreet did this pursuant to the Compliance Acknowledgement Updates that it had Plaintiffs sign which states:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to **fees of up to six percent per year for five years and all fees can be taken up front** or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

(Emphasis added).

387) Notably, Broadstreet did not simply say that it is entitled to a 30% upfront fee. Instead, Broadstreet said that it could pay itself "fees of up to six percent per year for five years

and all fees can be taken up front." By phrasing it this way, if Broadstreet collects five years of fees up front, then Broadstreet is obligated to provide five years of services.

388) Despite collecting five years of fees upfront, Broadstreet is now forcing Plaintiffs out of the BSG Fund without providing them with five years of service.

389) Accordingly, to the extent that Broadstreet overpaid itself for services never rendered, Broadstreet must return any excess fees it collected back to Plaintiffs.

**WHEREFORE** Plaintiffs demand judgment in their favor and against the Defendants for disgorgement of any excess fees Defendants collected from Plaintiffs, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT X**
**ACCOUNTING**
**Plaintiffs v. Defendants**

390) The proponents of this cause of action repeat and reallege paragraphs 1-278.

391) Plaintiffs have entrusted hundreds of thousands of dollars to Broadstreet, which has imposed upon Broadstreet the burden and duty of accounting for such funds.

392) As manager of the BSG Fund and fiduciary to the Plaintiffs, the Baldassarras and the remaining Defendants must produce an accounting.

393) Article IX Section 9.06 of the Operating Agreement entitled "Books and Records" explicitly states that:

> (a) The Manager, together with the Administrator (if any), shall keep books and records pertaining to the Company's and each Series' affairs showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series. Such books and records of the Company and its Series shall be kept at the Company's office (or at an Administrator's office as directed by the Manager from time to time).
>
> (b) Except as otherwise expressly provided in this Agreement, **each Member shall have the right to obtain any information contained in the books and records**

> **of the Company or its Series upon reasonable advance notice, including any information relating to the Company's or its Series' investment activity**.

(Emphasis added.)

394) Plaintiffs have a contractual right to obtain an accounting of the finances relating to each Series they are or were invested in. Accordingly, the Court should order the Defendants to provide the Plaintiffs with an accounting.

**WHEREFORE** Plaintiffs demand judgment in their favor and against the Defendants for an accounting providing the books and records pertaining to each Series that Plaintiffs were invested showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series, and such other relief as the Court deems appropriate and just.

**COUNT XI**
**CONTROL PERSON LIABILITY**
**Plaintiffs v. Feingold and Baldassarras Brothers**

395) The proponents of this cause of action repeat and reallege paragraphs 1-278.

396) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra acted as a controlling person as alleged herein.

397) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra had the power to control and did control the BSG Fund. Through their control they made decisions to (i) force ZSQR shares on Plaintiffs even though these investments were unsuitable for Plaintiffs' investment objectives and risk tolerance, and (ii) misrepresent the value of ZSQR shares to Plaintiffs.

398) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra pushed this investment on the BSG Fund investors, including Plaintiffs, so that they could keep for themselves

assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

399) Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra knew, or were reckless in not knowing, the fraudulent communications Broadstreet agents such as Glenn Hechler was making to investors in the BSG Fund, including Plaintiffs, to solicit them to invest in the BSG Fund and remain invested in the BSG Fund.

400) As control persons of the BSG Fund, Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are responsible for the actions of Broadstreet's agents including Glenn Hechler.

401) As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs have incurred damages in excess of **$370,000.00**.

**WHEREFORE**, Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are individually and personally liable to Plaintiffs as control persons of the BSG Fund for compensatory damages, plus punitive damages, prejudgment interest and costs.

**COUNT XII**
**CONSTRUCTIVE TRUST, EQUTABLE LIEN,**
**AND/OR SEGREGATION OF SALE PROCEEDS**
**Plaintiffs v. Defendants**

402) The proponents of this cause of action repeat and reallege paragraphs 1-278.

403) Plaintiffs are the proper legal and equitable owner of specific, traceable property, namely their investments in the BSG Fund.

404) Broadstreet intends to sell Plaintiffs' investments in the BSG Fund and make distributions to its partners who have certain levels of ownership in the business.

405) Broadstreet has not provided Plaintiffs with adequate consideration for their ownership interest in their investments in the BSG Fund.

406) This Court may impose an equitable or constructive trust over specific assets as a provisional or preliminary equitable measure to preserve identifiable property pending final determination of ownership.

407) To whatever extent the Court permits the sale of assets held in Plaintiffs' investments in the BSG Fund, which it should not, Plaintiffs should be entitled to a constructive trust over all proceeds until entitlement to the same can be resolved.

**WHEREFORE**, Plaintiffs demand that, if the Court permits the sale of assets pertaining to their investments in the BSG Fund to proceed, the Court exercise its authority to impose a preliminary constructive trust over any and all sale proceeds from these assets until such time as proper ownership, control, and other rights to those proceeds can be adjudicated.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs seek the following relief:

a. That the Court enters an order finding in Plaintiffs' favor on Counts I through XII;

b. That the Court award Plaintiffs compensatory damages in an amount to be determined at trial but believed to be at least **$370,000.00**;

c. That the Court award Plaintiffs punitive damages;

d. That the Court award Plaintiffs treble damages pursuant to Florida Statute § 772.11;

e. That the Court award Plaintiffs rescission and rescissionary damages;

f. That the Court enter an order against Defendants for disgorgement of fees paid by Plaintiffs;

g. That the Court enter an order for injunctive relief preventing Defendants from selling or transferring away assets of any investment Series that Plaintiffs have an ownership interest;

h. That the Court enter an order for Defendants to place any proceeds from the sale of any assets from a BSG Fund investment that Plaintiffs have an ownership interest into a constructive trust;

i. That the Court enter an order placing an equitable lien on behalf of Plaintiffs on any asset from a BSG Fund investment that Plaintiffs have an ownership interest in;

j. That the Court enter and order for Defendants to provide Plaintiffs with an accounting;

k. That the Court enter an order dissolving the BSG Funds, removing the manager from the BSG Funds, and appointing a Receiver to oversee the liquidation of the BSG Funds;

l. That the Court award Plaintiffs reasonable attorney's fees, costs and expenses pursuant to Florida Statute § 772.11;

m. That the Court award Plaintiffs the costs, including experts' fees, and other expenses incurred in the pursuit of this action;

n. That the Court award Plaintiffs pre- and post-judgment interest where appliable, including missing distribution payments owed to Plaintiffs pursuant to their selected investment Series in the BSG Fund;

o. For interest to run until the date that the award is fully paid and satisfied by Defendants;

p. That all costs of this action be taxed against Defendants; and

q. That the Court award such other and further relief as this Court may deem just and proper.

Plaintiffs reserve the right to amend the Complaint.

**JURY TRIAL DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Date: October 5, 2026

Respectfully Submitted,

**EPPERSON & GREENIDGE, P.A.**
20 South Olive Street, Suite 304
Media, Pennsylvania 19063
T. 877.445.9261
*/s/ Andrew M. Greenidge*
**ANDREW M. GREENIDGE, ESQ.**
Fla. Bar No. 0016581
andrew@eppersongreenidge.com
greenidgelaw@gmail.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I CERTIFY that on this 5th day of October 2026, the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Andrew M. Greenidge*
Andrew M. Greenidge, Esq.